### UNITED STATES of America,

v.

### George KANDIRAKIS, Defendant.

### Criminal Action No. 04–10372–WGY.

United States District Court,
D. Massachusetts.

Aug. 1, 2006.

Richard C. Bardi, Law Office of Richard C. Bardi, Rosemary C. Scapicchio, Law Office of Rosemary C. Scapicchio, James E. McCall, Boston, MA, Theodore A. Barone, Barone Law Offices, Terry Flukes, Robert J. Kelly Law Offices, Quincy, MA, for Defendants.

Nancy Rue, United States Attorney's Office, Boston, MA, for United States of America.

### *SENTENCING MEMORANDUM*

YOUNG, District Judge.

**"What is overlooked in post-*Booker* discussions is the fact that, for seventeen years, federal courts had been sentencing offenders unconstitutionally."[1]**

For seventeen years federal courts had been sentencing offenders unconstitutionally. Think about that. The human cost is incalculable—thousands of Americans languish in prison under sentences that today are unconstitutional. The institu-

---

1. Professor Douglas Berman, Remarks at Harvard Black Letter Law Association (Apr. 4, 2006).

tional costs are equally enormous—for seventeen years the American jury was disparaged and disregarded in derogation of its constitutional function; a generation of federal trial judges has lost track of certain core values of an independent judiciary because they have been brought up in a sentencing system that strips the words "burden of proof", "evidence", and "facts" of genuine meaning [2]; and the vulnerability of our fair and impartial federal trial court system to attack from the political branches of our government has been exposed as never before in our history.[3]

Today, elements in the legislature, a monolithic executive, and courts below the Supreme Court all seem to be acting in concert to devise a sentencing system as close to unconstitutionality as possible.[4] This Court has charted a different course—one that gives real meaning to the language of *all* the controlling decisions of the Supreme Court, yet scrupulously adheres to the rulings of that inferior court which controls the work of this one. It is a procedure that ensures significant protections for all litigants without added burden, wasted time, or cost to our system of justice.

This Sentencing Memorandum maps the legal landscape and explains the Court's procedures within it—all in the context of a well-tried case which required this Court to work through the implications of its own practices.

## I. The Prosecution—Opening Moves

On December 15, 2004, a federal grand jury indicted Jess Siciliano ("Siciliano"), Michael Arco ("Arco"), and George Kandirakis ("Kandirakis") for conspiracy and possession, with intent to distribute, oxycodone—known commonly by one of its trade names, OxyContin. The government charged that Siciliano was an OxyContin supplier and that Arco and Kandirakis

---

**2.** See United States v. Green, 346 F.Supp.2d 259, 280–82 (D.Mass.2004), *rev'd* 426 F.3d 64 (1st Cir.2005); and *rev'd sub nom.* United States v. Pacheco, 434 F.3d 106 (1st Cir.2006); United States v. Yeje–Cabrera, 430 F.3d 1 (1st Cir.2005).

**3.** See, e.g., United States v. Kirsch, 287 F.Supp.2d 1005, 1006–07 (D.Minn.2003) (Magnuson, J.) ("Congress and the Attorney General have instituted policies designed to intimidate and threaten judges into refusing to depart downward, and those policies are working. If the Court were to depart, the Assistant U.S. Attorney would be required to report that departure to the U.S. Attorney, who would in turn be required to report to the Attorney General. The Attorney General would then report the departure to Congress, and Congress could call the undersigned to testify and attempt to justify the departure. This reporting requirement system accomplishes its goal: the Court is intimidated, and the Court is scared to depart.").

**4.** See United States v. Navedo-Concepcion, 450 F.3d 54, 60 (1st Cir.2006) (Torruella, J., dissenting) ("I am concerned that we are, like a glacier in the ice age, inch by slow inch, regressing to the same sentencing posture we assumed before the Supreme Court decided *Booker* .... [I do not] believe that this is what the Supreme Court had in mind when it struck down the mandatory Guidelines regime."); Judge Nancy Gertner, *What Yogi Berra Teaches about Post–Booker Sentencing,* Yale L.J. (The Pocket Part), July 2006, http://www.thepocketpart.org/2006/07/gertner.html ("[W]ith each decision and report, the slide towards 'mandatoriness' has resumed. The courts and the [Sentencing] Commission are each walking the same path post-*Booker* as they had pre-*Booker* .... [L]ock step 'compliance' with Guidelines while intoning 'advisoriness' [ ] is not just bad policy or worse, hypocrisy; this time it will be unconstitutional."); *see also* Letter from Jon M. Sands, Federal Public Defender, to Hon. Ricardo Hinojosa, Chair, U.S. Sentencing Commission (July 19, 2006), Memorandum at 1 ("The Commission should not continue to recommend minimal constitutional protections."), *available at* http://sentencing.typepad.com/sentencing_law_and_policy/files/ defender_letter_to_ussc_71906.pdf.

were OxyContin retailers who got their illicit supplies from Siciliano. The government conceded that Kandirakis was the least involved of the three. Siciliano and Arco quickly copped pleas. The plea deals, proffered to the Court pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) [5], would result in a 46–month sentence for Siciliano and a 57–month sentence for Arco.[6]

The Court held an extensive plea colloquy with Siciliano and Arco, explaining the procedural protections it affords defendants who go to trial. *See infra* Part IV. From this colloquy, the Court concluded that both Siciliano and Arco had bargained down, for sentencing purposes, the quantity of OxyContin properly attributable to them, the government trading away provable facts in return for the certainty that comes from a plea.[7] The First Circuit explicitly embraces such "fact bargaining", even when relevant data is hidden from the Court. *See United States v. Yeje–Cabrera*, 430 F.3d 1, 23–30 (1st Cir.2005). While this is the ugly truth on which many plea-bargained sentences rest, so sweeping is our plea bargaining culture today, that it is a staple of criminal practice in this circuit and district.[8] Those who deny it [9]

**5.** A Rule 11(c)(1)(C) plea bargain crowds a judge into a "take it or leave it" position. It facilitates plea bargaining—today, the functional goal of our criminal justice system, see George Fisher, *Plea Bargaining's Triumph*, 109 Yale L.J. 857 (2000)—by requiring a judge to "give back" a plea if she imposes other than the sentence bargained for.

This, of course, adds a powerful, near-hydraulic pressure in favor of plea bargaining. While it theoretically still guards against extreme, sweetheart deals and monstrously draconian agreements, such safeguards are practically nil. In twenty-one years of service as a district judge, I have never refused such a plea once proffered. (I can make this statement with confidence since Donald Womack, the superb official court reporter assigned to this session, *see Miara v. First Allmerica Fin. Life Ins. Co.*, 379 F.Supp.2d 20, 69 n. 57 (D.Mass.2005), has provided to the Court and to the public a fully searchable database of all this Court's sentencing decisions at http://donwomack.com. *See infra* note 76.)

The reasons for the parties seeking to cabin judicial discretion are not hard to fathom. I have a deserved reputation for sentencing severely. *See, e.g., Berthoff v. United States*, 140 F.Supp.2d 50, 55 (D.Mass.2001) (sentencing at the top of the Guidelines range). At least, I did under the unconstitutional "mandatory Guidelines" system. Siciliano and Arco wished to avoid the risk of a sentence heavier than they could bargain. Ever the superb institutional litigant, however, the government as a repeat player, sensed (it probably keeps its own records) that in the present "advisory Guidelines" system, I am more likely than any of my colleagues in the District of Massachusetts to sentence below the advisory range (but not by much). U.S. Sentencing Commission, "Federal Sentencing Statistical Report Prepared for the Hon. Mark L. Wolf, Chief Judge" (2006) (providing individual district court judge and circuit court statistics on length of sentences imposed and Guidelines departure comparisons). The government naturally wished to force a sentence as severe as it could bargain.

**6.** The longer proposed sentence for the retailer Arco as compared with the supplier Siciliano is explained by Arco's lengthier criminal history.

**7.** In fairness to the government, it must be noted that during Kandirakis's sentencing hearing, the Court revised its view as to Arco, concluding that, in his case, the sentence imposed actually encompasses his relevant conduct.

**8.** *See, e.g., Yeje–Cabrera*, 430 F.3d at 23–30; *United States v. Thurston*, 358 F.3d 51 (1st Cir.2004); *United States v. Rodriguez*, 162 F.3d 135 (1st Cir.1998); *United States v. Bleidt*, No. 05–10144 (D. Mass filed June 5, 2005), Plea Hr'g, Dec. 5, 2005 (aged and vulnerable nature of many victims omitted to secure plea); *United States v. Fuller*, No. 05–10082 (D. Mass. filed Mar. 24, 2005), Plea and Sentencing Hr'g, Nov. 16, 2005 (fraud loss amount understated to secure plea); *United States v. Montilla*, No. 04–10160 (D. Mass. filed May 20, 2004), Sentencing Hr'g, Oct. 18, 2005 (drug quantity understated to secure plea).

are sophists, engaging in what one of my colleagues calls "a massive exercise in hypocrisy". *Berthoff*, 140 F.Supp.2d at 64.

Fearing the vindictive moral quagmire that the government creates when it posits a more favorable, alternative factual universe for those who will plead guilty, but then proves the actual facts against those who go to trial, this Court entertained Siciliano's and Arco's proffered pleas, but declined to accept or reject them until Kandirakis had been tried and, if necessary, sentenced.[10]

This done, the government and Kandirakis, gearing up for trial, "set [their] faces to the stormy sea [and] bid the land farewell." [11]

A necessary part of that preparation, for both the Court and counsel, involved significant legal analysis.

## II. A "Muddled" [12] Legal Landscape: The Two Faces of *Booker*

Eighteen months ago the Supreme Court issued its decision in *United States v. Booker*. 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). The case had promised to be the culmination of a reinvigoration in the criminal defendant's Sixth Amendment right to trial by jury, which the Court had begun several years before in *Apprendi v. New Jersey*. 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).[13] In *Apprendi*, the Court held that, "[o]ther than the fact of a prior conviction [14], any

9. *See* Amie N. Ely, Note, *Prosecutorial Discretion as an Ethical Necessity: The Ashcroft Memorandum's Curtailment of the Prosecutor's Duty to "Seek Justice"*, 90 Cornell L.Rev. 237, 252–59 (2005) (describing the Department of Justice's purported charging and sentencing policies).

10. It is clear that the First Circuit sees no vindictiveness where the government is willing to hide facts from the Court if there is to be a plea, but goes ahead and proves those facts if the plea deal falls through and the defendant goes to trial. *Yeje–Cabrera*, 430 F.3d at 23–30. Such analysis binds this Court. What remains unclear is whether that court discerns vindictiveness when one defendant gets the advantage of an imaginary universe of facts, and another, similarly situated defendant does not. *But see United States v. Thurston*, No. 05–2271, 456 F.3d 211, 216, 2006 WL 2065404, at *4–5 (1st Cir. July 26, 2006) (mandating a lengthy prison sentence for one defendant who went to trial, but probation for a co-defendant who pled; defendants were not similarly situated *because* one of them went to trial; yet this rule does not "impose a burden on [the defendant's] exercise of his constitutional right to a jury trial").

11. Tommy Makem, "Ballad of the Lady Jane", on *Lonesome Waters* (Shanachie Records 1986).

12. Douglas A. Berman, *Perspectives and Principles for the Post*-Booker *World*, 17 Fed. Sen-

tencing Rep. 231, 231 (2005) ("[T]he *Booker* decision made a conceptually muddled constitutional jurisprudence of sentencing even more opaque.").

13. The Court's decision in *Apprendi* had been foreshadowed the previous term in *Jones v. United States*, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), which construed a federal statute so as to avoid the constitutional question.

14. This caveat was the remnant of the Court's decision in *Almendarez–Torres v. United States*. 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998). The five-Justice majority included Justice Thomas, who all but recanted his support for that decision in *Apprendi*. *See* 530 U.S. at 518–23, 120 S.Ct. 2348 (Thomas, J., concurring). Since *Apprendi*, Justice Thomas has made only clearer his dissatisfaction with his vote in *Almendarez–Torres*. *See Rangel–Reyes v. United States*, —— U.S. ——, —— – ——, 126 S.Ct. 2873, 2874–75, 165 L.Ed.2d 910 (2006) (Thomas, J, dissenting from denial of certiorari); *Shepard v. United States*, 544 U.S. 13, 27–28, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005) (Thomas, J., concurring) ("*Almendarez–Torres* ... has been eroded by this Court's subsequent Sixth Amendment jurisprudence, and a majority of the Court now recognizes that [it] was wrongly decided. The parties do not request it here, but in an appropriate case, this Court should consider *Almendarez–Torres'[s]* continuing vi-

fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490, 120 S.Ct. 2348.[15]

The consequences of *Apprendi* for the Federal Sentencing Guidelines were immediately apparent. *See id.* at 550–51, 120 S.Ct. 2348 (O'Connor, J., dissenting). Though the facts of *Apprendi* involved legislatively enacted statutes, the constitutional rule of that case seemed equally to apply to all judge-based, determinate sentencing schemes. This Court so held on June 18, 2004, in *United States v. Green,* 346 F.Supp.2d 259 (D.Mass.2004), which ruled the Guidelines unconstitutional. *Green's* reasoning was confirmed days later in *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), which invalidated the State of Washington's nearly identical sentencing apparatus. Though the Supreme Court officially reserved the question, *id.* at 305 n. 9, 124 S.Ct. 2531, after *Blakely* it was quite obvious to many other observers that the Guidelines were unconstitutional. As soon as "the [Supreme] Court could get before it a case properly presenting the constitutionality of the mandatory [federal] Guidelines", they likewise were invalidated. *Booker,* 543 U.S. at 313, 125 S.Ct. 738 (Scalia, J., dissenting in part).

*Booker* could have been the simple, logical extension of the Supreme Court's *Apprendi* jurisprudence. Instead, the Court produced a fractured, 124–page decision with two majority opinions and four dissents. What remained after the verbal cannonades was this:

- One majority opinion ("Constitutional *Booker*") which ruled that the Guidelines violated the Sixth Amendment. This opinion was written by Justice Stevens and joined by Justices Scalia, Souter, Thomas, and Ginsburg.

- Another majority opinion ("Remedial *Booker*") which ruled that the way to rectify the constitutional infirmity was to make the Guidelines advisory rather than mandatory. This opinion was written by Justice Breyer and joined by Chief Justice Rehnquist and Justices O'Connor, Kennedy, and Ginsburg.

How logically to implement these two majority opinions has been a question with which the lower federal courts have been grappling ever since.

### A. Constitutional *Booker*

The constitutional decision in *Booker* is quite succinct. A review of the Court's Sixth Amendment jurisprudence—especially its *Blakely* decision—yielded but one conclusion: "[T]here is no distinction of constitutional significance between the Federal Sentencing Guidelines and the Washington procedures at issue in that case." *Booker,* 543 U.S. at 233, 125 S.Ct. 738. As quoted above, the rule set forth in *Apprendi* is that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be sub-

---

ability. Innumerable criminal defendants have been unconstitutionally sentenced under the flawed rule ...." (citations omitted)). The issue not having been revisited by the Court, however, it is still "good law". *See Booker,* 543 U.S. at 244, 125 S.Ct. 738.

But see *Rangel–Reyes,* 126 S.Ct. at 2873 (Stevens, J.) ("While I continue to believe that *Almendarez–Torres v. United States,* 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998),

was wrongly decided, that is not sufficient reason for revisiting the issue.").

**15.** *Apprendi* is fast becoming one of the most-cited Supreme Court cases ever. *See* Adam N. Steinman, *The Irrepressible Myth of* Cylotex: *Reconsidering Summary Judgment Burdens Twenty Years after the Trilogy,* 63 Wash. & Lee L.Rev. 81, 144–45 (2006) (showing *Apprendi* as the 24th most-cited case by all courts, despite being only 6 years old).

mitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490, 120 S.Ct. 2348. As further explicated in *Blakely*, "the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings." 542 U.S. at 303–04, 124 S.Ct. 2531.

The mandatory nature of the Guidelines was crucial. "If the Guidelines as currently written could be read as merely advisory provisions that recommended, rather than required, the selection of particular sentences in response to differing sets of facts, their use would not implicate the Sixth Amendment. ... Indeed, everyone agrees that the constitutional issues presented by these cases would have been avoided entirely if Congress had omitted from the [Sentencing Reform Act of 1984] the provisions that make the Guidelines binding on district judges...." *Booker*,

543 U.S. at 233, 125 S.Ct. 738. Therefore, after rejecting *stare decisis* and separation of powers arguments, the Court "reaffirmed [its] holding in *Apprendi*" and declared the Guidelines unconstitutional. *Id.* at 239–43, 244, 125 S.Ct. 738.

## B. Remedial *Booker*

The second majority seized on the mandatory nature of the Guidelines in remedying their unconstitutionality. *Booker*, 543 U.S. at 244–71, 125 S.Ct. 738. Consequently, rather than grafting the Sixth Amendment's jury right onto the Guidelines (the solution preferred by the Justices of Constitutional *Booker*, minus Justice Ginsburg) or discarding the Guidelines altogether (a solution no Justice supported), Remedial *Booker* papered over the Guidelines' Sixth Amendment infirmity by "sever[ing] and excis[ing]" two sections of Title 18 that made the Guidelines mandatory for sentencing [16] and appellate [17]

---

**16.** Title 18, Section 3553 provides in relevant part:

(a) *Factors to be considered in imposing sentence.*—The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—
(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed—
(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established for—

(A) the applicable category of offense committed by the applicable category of defendants as set forth in the guidelines issued by the Sentencing Commission pursuant to section 994(A)(1) of title 28, United States Code, and that are in effect on the date the defendant is sentenced;
...
(5) any pertinent policy statement issued by the Sentencing Commission pursuant to section 994(a)(2) that is in effect on the date the defendant is sentenced;
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.
(b) *Application of guidelines in imposing a sentence.*—
(1) *In general.* Except as provided in paragraph (2), the court shall impose a sentence of the kind, and within the range, referred to in subsection (a)(4) unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guide-

courts. *Id.* at 245, 249, 125 S.Ct. 738. Doing so made the Guidelines "effectively advisory". *Id.* at 245, 125 S.Ct. 738.

Section 3553(b)(1) of the U.S.Code required the district court to impose a sentence "of the kind[ ] and within the range" set forth in the Guidelines. Striking this Section, the Court ruled that what remained still "requires judges to take account of the Guidelines together with other sentencing goals." *Id.* at 259, 125 S.Ct. 738 (citing 18 U.S.C. § 3553(a)). Thus, "[t]he district courts, while not bound by the Guidelines, must consult those Guidelines and take them into account when sentencing." *Id.* at 264, 125 S.Ct. 738. "It requires a sentencing court to consider the Guidelines ranges, but it permits the court to tailor the sentence in light of other statutory concerns as well." *Id.* at 245–46, 125 S.Ct. 738 (citations omitted).

Further, the Court struck Section 3742(e). *Id.* at 260–67, 125 S.Ct. 738. That Section had given the Circuit Courts of Appeals *de novo* review of sentences falling outside the prescribed Guidelines range. *See* 18 U.S.C. § 3742(e)(3)(B)(ii). In its place, the Court established a standard of "reasonableness". Stating that the appellate courts were "already familiar" with the standard from "the past two decades of appellate practice in cases involving departures", the Court said that circuit courts should look to the factors set forth in Section 3553(a) to guide them, "as they have in the past". *Booker,* 543 U.S. at 261, 125 S.Ct. 738. Disclaiming Justice Scalia's "belief that use of a reasonableness standard '[would] produce a discordant symphony' leading to 'excessive sentencing disparities,' and 'wreak havoc' on the judicial system", the Remedial *Booker* majority concluded that, as the Sentencing Commission "continue[s] to modify its Guidelines", it would "encourag[e] what it finds to be better sentencing practices." *Id.* at 263, 125 S.Ct. 738. This tack would "thereby promote uniformity in the sentencing process", *id.,* and allow circuit courts to "iron out sentencing differences", *id.* at 263, 125 S.Ct. 738.

lines that should result in a sentence different from that described. . . . .

17. Title 18, Section 3742(e) provides:

*Consideration.*—Upon review of the record, the court of appeals shall determine whether the sentence—
(1) was imposed in violation of the law;
(2) was imposed as a result of an incorrect application of the sentencing guidelines;
(3) is outside the applicable guideline range, and
(A) the district court failed to provide the written statement of reasons required by section 3553(c);
(B) the sentence departs from the applicable guideline range based on a factor that—
(i) does not advance the objectives set forth in section 3553(a)(2); or
(ii) is not authorized under section 3553(b); or
(iii) is not justified by the facts of the case; or

(C) the sentence departs to an unreasonable degree from the applicable guidelines range, having regard for the factors to be considered in imposing a sentence, as set forth in section 3553(a) of this title and the reasons for the imposition of the particular sentence, as stated by the district court pursuant to the provisions of section 3553(c); or
(4) was imposed for an offense for which there is no applicable sentencing guideline and is plainly unreasonable.
The court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous and, except with respect to determinations under subsection (3)(A) or (3)(B), shall give due deference to the district court's application of the guidelines to the facts. With respect to determinations under subsection (3)(A) or (3)(B), the court of appeals shall review de novo the district court's application of the guidelines to the facts.

## C. Contradictions

**"The Federal Sentencing Guidelines are dead. Long live the Federal Sentencing Guidelines."[18]**

As Judge Michael W. McConnell of the Tenth Circuit has noted, the two *Booker* opinions, "taken in tandem, do not get high marks for consistency or coherence.... The most striking feature of the *Booker* decision is that the remedy bears no logical relation to the constitutional violation." Michael W. McConnell, *The* Booker *Mess*, 83 Denver U.L.Rev. 665, 677 (2006).[19] The constitutional violation of the Guidelines was that judges, rather than juries, found the facts necessary for sentencing. Instead of focusing the remedy on who performed the fact-finding, however, Remedial *Booker* honed in on the "necessity" of the facts. It purported to make those facts "unnecessary" by making the Guidelines "effectively advisory". As a result, "[t]he jury verdict is no more consequential after *Booker* than it was before". McConnell, *supra*, at 677. "All the things that troubled Sixth Amendment purists about the pre-*Booker* Guidelines system are unchanged", including reliance on uncharged and even acquitted conduct. *Id.*; *see Booker*, 543 U.S. at 302, 125 S.Ct. 738 (Stevens, J., dissenting in part) ("[T]he Court [in Remedial *Booker* ] has effectively eliminated the very constitutional right *Apprendi* sought to vindicate.").

The way in which most circuit courts have decided to review the countless criminal sentences issued under the pre-*Booker*, mandatory Guidelines system illustrates this contradiction well. The First Circuit[20] confronted the question in *United States v. Antonakopoulos*. 399 F.3d 68 (1st Cir.2005). The court first framed the issue: "The *[Booker]* error is not that a judge (by a preponderance of the evidence) determined facts under the Guidelines which increased a sentence beyond that authorized by the jury verdict or an admission by the defendant; the error is only that the judge did so in a mandatory Guidelines system." *Id.* at 75. Formulating the error this way brings the contradiction of *Booker* into stark relief: Reading the *Apprendi* line of cases—including Constitutional *Booker*—one naively might have thought judicial fact-finding was *precisely* the constitutional error. Because Remedial *Booker* allowed the Guidelines' unconstitutionality to be remedied by concocting an advisory system, however, it is hard to find fault with the ruling in *Antonakopoulos*.

This premise then led the First Circuit to conclude that for a defendant to receive the benefits of *Booker*, he must "point to circumstances creating a reasonable probability that the district court would impose a different sentence more favorable to [him] under the new 'advisory Guidelines'

---

**18.** Edward Lazarus, "The Supreme Court's Sentencing Guidelines Decision: Its Logic, and Its Surprisingly Limited Practical Effect", Jan. 21, 2005, *at* http://writ.news.findlaw.com/lazarus/20050121.html.

**19.** *See also United States v. Cage*, 451 F.3d 585, 591–94 (10th Cir.2006); Frank O. Bowman, *Beyond Band–Aids: A Proposal for Reconfiguring Federal Sentencing After* Booker, 2005 U. Chi. Legal F. 149, 182 ("[One] mystery about the *Booker* remedial opinion is how it can possibly be squared with either the announced black-letter rule or the underlying theory of the *Blakely* opinion it purports to

apply."); David J. D'Addio, *Sentencing After* Booker: *The Impact of Appellate Review on Defendants' Rights*, 24 Yale L. & Pol'y Rev. 173, 174 (2006) ("How these two majority opinions fit together remains a puzzle, in part because of an inherent contradiction in Justice Breyer's remedial opinion.").

**20.** For obvious reasons, this Sentencing Memorandum will focus primarily on First Circuit decisions. Not much of what will be said is unique to the decisions of that court, though. Where relevant, decisions from other circuit courts will be noted.

*Booker* regime." *Id.* The court said that "this is a necessary consequence of our view of the nature of the *Booker* error." *Id.* at 79. The First Circuit is not alone. *See United States v. Liner,* 435 F.3d 920 (8th Cir.2006); *United States v. Graham,* 413 F.3d 1211 (10th Cir.2005); *United States v. Ameline,* 409 F.3d 1073 (9th Cir. 2005); *United States v. Mares,* 402 F.3d 511 (5th Cir.2005); *United States v. Lee,* 399 F.3d 864 (7th Cir.2005); *United States v. Rodriguez,* 398 F.3d 1291 (11th Cir. 2005); *see also United States v. Crosby,* 397 F.3d 103 (2d Cir.2005).[21] The obvious disconnect between these decisions and the principle of Constitutional *Booker* was the earliest tangible indication that *Booker* is flawed.

Even more than what circuit courts have done with pre-*Booker* sentences, however, the emerging jurisprudence of Remedial *Booker's* "reasonableness" review in the circuit courts shows how that opinion necessarily is at war with Constitutional *Booker.* Two cases from the First Circuit will serve to illustrate.

In *United States v. Jimenez–Beltre,* 440 F.3d 514 (2006), the First Circuit sitting *en banc* set forth its instructions to district courts regarding the role the Guidelines should play in sentencing. Affirming the procedure of Judge F. Dennis Saylor, who gave the Guidelines "substantial" (but not "controlling") weight, the court held that a sentencing judge should "first calculate the guideline sentence, then determine whether departures were warranted under the guidelines, and finally determine whether a non-guideline sentence was warranted by the relevant factors set forth in 18 U.S.C. § 3553(a) (2000)." *Id.* at 516.

Further, in *United States v. Pho,* 433 F.3d 53 (1st Cir.2006), the First Circuit articulated a significant limit on the acceptable justifications for a non-Guidelines sentence. In Pho the district court had sought to reduce the infamous 100:1 ratio between a Guidelines sentence for crack-versus powder-cocaine.[22] *Id.* at 57–59.

21. *But see United States v. Oliver,* 397 F.3d 369, 377–81 (6th Cir.2005) ("A sentencing error that leads to a violation of the Sixth Amendment by imposing a more severe sentence than is supported by the jury verdict would diminish the integrity and public reputation of the judicial system and also would diminish the fairness of the criminal sentencing system." (internal quotation marks omitted)); *United States v. Davis,* 397 F.3d 173 (3d Cir.2005); *United States v. Hughes,* 396 F.3d 374, 379–81 (4th Cir.2005) ("[T]o leave standing this sentence imposed under the mandatory guideline regime, we have no doubt, is to place in jeopardy the fairness, integrity or public reputation of judicial proceedings." (footnote and internal quotation marks omitted)); *see also United States v. Williams,* 399 F.3d 450, 459 (2d Cir.2005) (following contrary circuit precedent, but stating that the procedure followed by the Third, Fourth, and Sixth Circuits to be "far more consonant with precepts of justice").

22. This popular nomenclature is slightly—but significantly—inaccurate. There are *three* forms of cocaine relevant to the criminal code and the Guidelines. Title 21, Section 841 of the U.S.Code sets forth mandatory minima which are triggered at the 100:1 ratio for crimes involving powder-cocaine and "cocaine base", respectively. Cocaine base has been held to mean a form of cocaine which generally is smoked, as opposed to powder-cocaine which generally is snorted. *See United States v. Lopez–Gil,* 965 F.2d 1124, 1129–31 (1st Cir.1992). The Guidelines, on the other hand, use the term "cocaine base" synonymously with "crack-cocaine". *See* United States Sentencing Commission, *Guidelines Manual* § 2D1.1(c), comment (n. (D)) (Nov. 2005). In reality, "crack-cocaine" is only a subset of "cocaine base" as used in the statute. *United States v. Medina,* 427 F.3d 88, 92 n. 3 (1st Cir.2005).

The difference between crack-cocaine and other forms of cocaine base (presumably the more pure, and less popular, "freebase" of Richard Pryor fame) is in the chemical process used in their creation. The Guidelines dichotomy, unlike the statutory distinction between powder-cocaine and cocaine base, is not based upon chemical composition, rather only physical characteristics. Still, the Guidelines equate freebase-cocaine with pow-

That the defendant's sentencing took place post-*Booker* enabled that court, so it thought, to fashion a more just sentence. It applied a 20:1 ratio instead and derived a revised range within which the court then sentenced the defendant. *Id.* at 58, 59.

Reviewing congressional and Commission history on the issue, the First Circuit concluded that because the ratio was a policy decision of the Congress[23], the district court had erred by "jerry-buil[ding]" its own Guidelines range. *Id.* at 58, 59, 64. "This approach [of the district court], which evinced a categorical, policy-based rejection of the 100:1 ratio, amounted to error as a matter of law." *Id.* at 62. It was "a policy judgment, pure and simple." *Id.* Any departure from the Guidelines is to be "based on case-specific circum-

stances, not on general, across-the-board policy considerations." *Id.* To do otherwise would jeopardize the uniformity sought by the Sentencing Reform Act.[24]

Even a cursory glance at the plain language of *Jimenez–Beltre* and *Pho* indicates the continued significance of the Guidelines in criminal sentencing. Upon closer consideration, however, that significance proves functionally tantamount to a determinative (and thus unconstitutional) limitation on sentencing discretion.

With regard to the prohibition on policy-based justifications announced in *Pho,* consider that the whole of the Guidelines—albeit through its "junior-varsity Congress", the Sentencing Commission, *Mistretta v. United States,* 488 U.S. 361, 427, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (Scalia, J., dissenting)—is but one big policy statement of Congress.[25] The Guidelines

---

der-cocaine, separating those two forms from crack-cocaine for sentencing purposes. *See* U.S.S.G.App. C, amend. 487. Thus, to speak of a dichotomy between powder- and crack-cocaine leaves ambiguous the status of free-base-cocaine, which the statute and the *Guidelines* treat differently. The factual distinctions among these three forms of cocaine may be of critical import in imposing sentences.

Judge Torruella of the First Circuit has recently authored two opinions of admirable clarity and precision, exhibiting an uncommon understanding of these distinctions. *United States v. Anderson,* 452 F.3d 66, 83–87 (1st Cir.2006); *United States v. Brown,* 450 F.3d 76, 79–81 (1st Cir.2006).

**23.** The 100:1 Guidelines ratio certainly is the policy of Congress more so than most other aspects of the Guidelines. Several years after having adopted the 100:1 ratio, the Commission attempted to reduce it to the very 20:1 ratio employed by the district Court in *Pho.* Congress rejected this change. It had not, however, originally mandated its ratio "root and branch" into the Guidelines; the statutory dichotomy is both different from the Commission's and more chemically astute. Title 21, Section 841 of the U.S.Code sets forth mandatory minima which are triggered by crimes involving powder-cocaine and cocaine base at the 100:1 ratio. The Guidelines, on

the other hand, use the 100:1 ratio in devising which sentencing ranges correlate with certain amounts of non-crackversus crack-cocaine. *See* U.S.S.G. § 2D1.1(c).

If the Commission truly had followed the original congressional policy expressed in the statute, it would have followed the statutory dichotomy, as opposed to creating one of it own. As a consequence, the tortured harmonization of the statute and Guidelines is that crimes involving freebase-cocaine (statutory "cocaine base") are subject to the same statutory mandatory minima as crack-cocaine, but not to the enhanced Guideline ranges. *See supra* note 22.

**24.** *See also United States v. Miller,* 450 F.3d 270, 273–76 (7th Cir.2006); *United States v. Duhon,* 440 F.3d 711, 720 (5th Cir.2006); *United States v. Eura,* 440 F.3d 625, 632–34 (4th Cir.2006); *United States v. Lazenby,* 439 F.3d 928, 933 (8th Cir.2006) (stating that a desire for more lenient sentences generally was "an issue for Congress, not a valid basis for exercising discretion under *Booker.*"); *United States v. Green,* 436 F.3d 449, 459 (4th Cir.2006); *United States v. Sebastian,* 436 F.3d 913, 915–16 (8th Cir.2006).

**25.** *Cage,* 451 F.3d at 593 ("When a district court makes a sentencing decision, it must interpret Congress's intentions in passing sen-

express the relative weight Congress gives to various factors considered at sentencing. If a sentencing court may not depart from a Guidelines range for policy reasons contradictory to those expressed therein, then the *only* way to ensure respect for those policy choices is through enforcement of the Guidelines themselves. *Pho* accomplishes this.

In *Pho*, the relevant policy expressed in the Guidelines was that persons guilty of "crack crimes" be eligible for the same sentences as those found guilty of mere "powder crimes", though having possessed 100–times less cocaine. The 100:1 policy decision, however, is no different than any other Guidelines ratio. According to the Guidelines, it is 7 times worse if the loss from a robbery exceeds $5 million than if it is less than $10,000. *See* U.S.S.G. § 2B3.1(b)(7) (providing a 7–level enhancement for the former, but 1 level for the latter).[26] It is twice as serious to cause a death while operating a common carrier while under the influence than it is if a less-than-serious injury resulted. *See* U.S.S.G. § 2D2.3(a) (providing a 26–level enhancement for the former, but 13 levels for the latter). Apparently, illegally receiving 1000 firearms is five times worse than receiving 5. *See* U.S.S.G. § 2K2.1(b)(1) (providing a 10–level enhancement for the former, but 2 levels for the latter). And it is 50 percent worse to discharge a toxic substance if you do so

continuously as opposed to just once. *See* U.S.S.G. § 2Q1.2(b)(1) (providing a 6–level enhancement for the former, but 4 levels for the latter). There are also inherent policy judgments for incongruous facts: It is worse to mail obscene matter to a minor, *see* U.S.S.G. § 2G3.1(b)(1)(C) (5–level enhancement), than it is to discharge pollutants and cause disruption of public utilities, see U.S.S.G. § 2Q1.3(b)(3) (4 levels), or than it is to be a supervisor of a criminal activity, *see* U.S.S.G. § 3B1.1(b) (3 levels), or than it is for the abetter in an escape to be a correctional employee, *see* U.S.S.G. § 2P1.1(b)(4) (2 levels). Furthermore, though certain victims may think otherwise, it is worse to inflict permanent or life-threatening injury to someone while assaulting them, *see* U.S.S.G. § 2A2.2(b)(3)(C) (7–level enhancement), than while robbing them, see U.S.S.G. § 2B3.1(b)(3)(C) (6 levels), or while kidnapping them, *see* U.S.S.G. § 2A4.1 (b)(2)(A) (4 levels).

None of this is to criticize the policy choices Congress, through the Commission, has made. The point merely is that these 7:1, 2:1, 5:1, 1.5:1, 5:4:3:2, and 7:6:4 Guidelines ratios[27] are no different than the 100:1 Guidelines ratio for crack-versus non-crack-cocaine ruled controlling in Pho. If a sentencing court imposes a non-Guidelines sentence based on its own conclusions about the relevance or relative significance of facts deemed relevant by the Guidelines,

---

tencing laws. The Sentencing Guidelines are an expression of that intent....”); Comment, *United States v. Pho: Reasons and Reasonableness in Post*–Booker *Appellate Review*, 115 Yale L.J. 2183, 2191 (2006) (“[B]eneath almost every provision lies a policy judgment deserving of some measure of judicial respect.”).

26. The relative comparisons of Guidelines enhancements herein do not equate to the same relative length of recommended sentences. Enhancements simply adjust the base offense level.

27. To be scrupulously accurate, it must be noted that these enhancements should be considered in relation to the base offense levels to which they are added. Thus, there may be good reason, in light of the underlying crime, that the same conduct warrant a greater enhancement in certain situations than in others. Though this observation may detract from the numerical accuracy of the stated ratios, it does not weaken their status as policy choices.

it necessarily derogates policy choices of Congress.

The First Circuit did leave open the possibility of imposing a non-Guidelines sentence "grounded in case-specific considerations". *Pho*, 433 F.3d at 65. That court claimed it "d[id] not intend to diminish the discretion that, after *Booker*, district courts enjoy in sentencing matters.... [Its] goal [wa]s simply to channel the district courts' newfound discretion in ways that both comport with the *Booker* Court's remedial opinion and respect the separation of powers between the legislative and judicial branches of government." *Id.* Upon examining the hundreds of pages constituting the Guidelines, however, there are few factors that remain case-specific; the Guidelines have considered, accounted for, and determined congressional *policy* for the relative treatment of countless facts that otherwise might be deemed case-specific. Many of these Guidelines are even conveniently labeled "Policy Statement[s]", instructing a court on how to handle factors "ordinarily not relevant", "of a kind not adequately taken into consideration [by the Guidelines]" (whether identified by the Guidelines or not), or "present to a degree not adequately taken into consideration". U.S.S.G. §§ 5H1.1–1.12, 5K2.0(a)(2)-(4). The Guidelines state that such deviations are warranted only in "exceptional" cases, U.S.S.G. § 5K2.0(a)(2)-(4), and are predicted to be "highly infrequent", U.S.S.G. § 1A1.1 (Part A.4. (b)) (Editorial Note).

By *Pho's* standards, then, the Guidelines effectively make the treatment of every conceivable fact potentially relevant to sentencing an expressed policy decision of Congress. Perhaps recognizing this, the First Circuit seemingly has stepped back from the full implications of *Pho* and also ruled that simply because "a factor is discouraged or forbidden under the guidelines[, that] does not automatically make it irrelevant when a court is weighing the statutory factors [18 U.S.C. § 3553(a)(1)-(7) ] apart from the guidelines. The guidelines—being advisory—are no longer decisive as to factors any more than as to results." *United States v. Smith*, 445 F.3d 1, 5 (2006). The court quickly added, however, that "reliance on a discounted or excluded factor may ... have some bearing on reasonableness." *Id.; see United States v. Zapete–Garcia*, 447 F.3d 57, 60 (1st Cir.2006) ("Although this [Guidelines] policy statement is no longer binding, one of the seven factors a judge must consider in sentencing is 'any pertinent policy statement issued by the Sentencing Commission.' Therefore, while not controlling, the policy statement prohibiting reliance on arrest records must be duly considered by the district judge." (citations omitted)). Respectfully, appellate guidance concerning when it is permissible for a sentencing court to deviate from the suggested Guideline range, based on what facts, is mind-numbingly incoherent.[28] The First Circuit is not necessarily to blame; Remedial *Booker*, though, certainly is.

---

**28.** *Compare, e.g., United States v. Green*, 436 F.3d 449, 459 (4th Cir.2006) ("While [a defendant's employment record, which is "not ordinarily relevant",] might support generally a departure from the Sentencing Guidelines, it may be relied upon then only if the factor is present to an exceptional degree."), *with United States v. Jackson*, 408 F.3d 301, 305 n. 3 (6th Cir.2005) ("To the extent that the district court in resentencing relies on any factors which are deemed by the Guidelines to be prohibited or discouraged, the district court will need to address these provisions and decide what weight, if any, to afford them

in light of *Booker*." (citations omitted)), *and with United States v. Hampton*, 441 F.3d 284, 289 (4th Cir.2006) ("Without deciding if a variance could be based on the existence of a factor discouraged as a basis for departure under the guidelines....").

*Compare also, e.g., United States v. Ossa–Gallegos*, 453 F.3d 371 (6th Cir.2006) (approving of a district court's slight reduction in the defendant's sentence due to disparity with similarly situated defendants in so-called "fast track" districts), *with United States v. Martinez–Flores*, 428 F.3d 22, 29 n. 3 (1st Cir.

*Jimenez–Beltre,* with its debate among the judges of the First Circuit, demonstrates Remedial *Booker's* contradictions more clearly still. In ruling that the Guidelines are to receive "substantial" weight, the majority of the First Circuit stated that its "conclusion [wa]s rooted in both parts of the *Booker* decision". *Jimenez–Beltre,* 440 F.3d at 518. The court first rejected the government's argument that a sentence within the Guidelines was per se reasonable, *id.* at 517, before then declaring that "the guidelines continue in our view to be an important consideration in sentencing . . .", *id.* at 518. The court acknowledged that even though "making the guidelines 'presumptive' or 'per se reasonable' does not make them mandatory, it tends in that direction". *Id.* Still, the Guidelines "cannot be called just 'another factor' in the statutory list, 18 U.S.C. 3553(a) (2000), because they are the only *integration* of the *multiple* factors". *Id.* The fact that the Guidelines are promulgated by an "expert" agency and that they were important to promoting remedial *Booker's* "uniformity and fairness" concerns counseled in favor of their continued central role. *Id.*

Judge Howard concurred in the result, but would have held within-Guidelines sentences per se reasonable. *See id.* at 523 ("[T]here is a range of 'reasonable' sentences which always will include within it the guidelines sentencing range. . . ."). This, he reasoned, was because " '[r]eason-

ableness' within the meaning of *Booker* . . . is 'reasonableness in light of Congress's purposes in enacting the Sentencing Reform Act of 1984.' " *Id.* at 521–22. "The guidelines therefore are not only central to the uniformity that Congress sought to bring about in passing the Act; they also are the data-driven and experienced-based manifestations of Congress's considered views on how, in the usual case, to accomplish the purposes of federal sentencing." *Id.* at 522. Judge Howard observed that "the primary theme of Justice Breyer's remedial opinion is that Congress's purposes were and are valid, and that federal judges should strive to apply the Act (and the regime created by the Act, almost all of which was left intact) to further those purposes." *Id.* "[T]he guidelines . . . are the only conceivable centers of gravity around which some semblance of uniformity in federal sentencing might be maintained. . . ." *Id.* at 522–23.

Judge Lipez, on the other hand, dissented and would have ruled that the Guidelines are merely an important first step. Beyond that, however, "[t]here is scant difference between treating a guidelines sentence as presumptively controlling and stating that the court will depart from that sentence only for 'clearly identified and persuasive reasons.' " *Id.* at 524 (quoting Judge Saylor at the sentencing hearing). By organizing sentencing decisions around the Guidelines and only focusing on the question of whether a non-Guidelines sentence is reasonable, courts "will effectively

2005) ("It is arguable that even post-*Booker,* it would never be reasonable to depart downward based on disparities between fast-track and non-fast-track jurisdictions given Congress' clear (if implied) statement in the PROTECT Act provision that such disparities are acceptable.").

*Compare also, e.g., United States v. Boscarino,* 437 F.3d 634, 638 (7th Cir.2006) ("[T]he kind of 'disparity' with which § 3553(a)(6) is concerned is an unjustified difference across

judges (or districts) rather than among defendants to a single case."), *with Thurston,* 2006 WL 2065404, at *4, 456 F.3d at 216 ("[O]ne possible problem with the [district] court's rationale was the emphasis on disparities between codefendants without giving significant consideration to encouraging nationwide uniformity in sentencing—the primary focus of § 3553(a)(6)."), *and with United States v. Lazenby,* 439 F.3d 928, 933 (8th Cir.2006) (reversing sentence due to disparate sentence of co-defendant).

give the guidelines a controlling weight and a presumptive validity that is difficult to defend under the constitutional ruling in Booker." *Id.* at 528. Having the sentencing court start the process by calculating the Guidelines is "sensible" because "[t]he guidelines are the only sentencing factor that yield a measure of time. That fact alone establishes their continuing importance.... With [the Guidelines'] focus on the bottom line, the prosecution and defense counsel will inevitably address their arguments to the appropriateness or inappropriateness of a guidelines sentence." *Id.* at 525. Such a method would "steer a sensible course between" the two *Booker* opinions. *Id.* at 525.

This display by the First Circuit shows the judges of that court grappling with the inconsistency of *Booker*. Every judge was attempting faithfully to implement the mandates of that decision, yet doing so proved difficult in the face of its incoher-

ence. When forced to reconcile the inconsistency, Judge Lipez placed more weight on Constitutional *Booker*[29], Judge Howard on Remedial *Booker*[30], and the majority somewhere in between.

Is this but a manufactured debate? Indeed, the only clear mandate from the Supreme Court going forward is that sentencing courts "consult [the] Guidelines and take them into account when sentencing." *Booker*, 543 U.S. at 264, 125 S.Ct. 738. From this language, why the Guidelines should receive any special emphasis over the other factors in Section 3553(a) is quite unclear. *See* D'Addio, *supra*, at 175–78 ("*Booker* imposes no legal obligation on judges to place any particular weight on the Sentencing Guidelines."). This fact certainly was not lost on anyone: Both Judges Howard and Lipez acknowledged that nothing in *Booker* required his particular interpretation.[31] If all that a sentencing judge must do, however, is "consult"

29. *See Jimenez–Beltre*, 440 F.3d at 528 n. 11 (Lipez, J., dissenting) ("Many commentators argue that by giving the guidelines controlling weight, and abdicating the responsibility to take account of the other section 3553(a) factors, courts effectively make the guidelines as binding as they were before *Booker*, thereby violating *Booker's* constitutional command." (internal quotation marks and alteration omitted)).

30. *See Jimenez–Beltre*, 440 F.3d at 522 (Howard, J., concurring) (noting that the "primary theme of Justice Breyer's remedial opinion" was that the Act—and, therefore, the Guidelines—should be given effect).

31. *See Jimenez–Beltre*, 440 F.3d at 521 (Howard, J., concurring) ("Certainly I cannot say that these positions are required by the language of *Booker* (nor, however, are they inconsistent with that language)."); *id.* at 528 n. 11 (Lipez, J., dissenting) (quoting Justice Scalia's dissent to Remedial *Booker* "stating that 'logic compels the conclusion that the sentencing judge, after considering the recited factors (including the Guidelines), has full discretion, as full as what he possessed before

the Act was passed, to sentence anywhere within the statutory range. If the majority thought otherwise ... its opinion would surely say so.' " (citing *Booker*, 543 U.S. at 305, 125 S.Ct. 738) (alteration in original)).

*See also Booker*, 543 U.S. at 300, 125 S.Ct. 738 (Stevens, J., dissenting in part) ("True, judges must still *consider* the sentencing range contained in the Guidelines, but that range is now nothing more than a suggestion that may or may not be persuasive to a judge ...."); *id.* at 306 n. 4, 125 S.Ct. 738 (Scalia, J., dissenting in part) ("The closest the remedial majority dares come to an assertion that the Guidelines must be followed is the carefully crafted statement that '[t]he district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing.' The remedial majority also notes that the Guidelines represent what the Sentencing Commission 'finds to be better sentencing practices.' True enough, but the Commission's view of what is 'better' is no longer authoritative, and district judges are free to disagree—as are appellate judges." (citations omitted, alteration in original)).

the Guidelines—a concept straightforward enough—what is the source of this disagreement?

One of Judge Howard's observations answers the question: "[T]he primary theme of Justice Breyer's remedial opinion is that Congress's purposes were and are valid, and that federal judges should strive to apply the Act (and the regime created by the Act, almost all of which was left intact) to further those purposes." *Jimenez–Beltre*, 440 F.3d at 522. Countless courts and commentators have concluded the same. *See, e.g., United States v. Mykytiuk*, 415 F.3d 606, 607 (7th Cir.2005) ("But while a *per se* or conclusively presumed reasonableness test would undo the Supreme Court's merits analysis in *Booker*, a clean slate that ignores the proper Guidelines range would be inconsistent with the remedial opinion."); *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir.2005) ("These principles change the Guidelines from being mandatory to being advisory, but it is important to bear in mind that *Booker/Fanfan* and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge. Thus, it would be a mistake to think that, after *Booker/Fanfan*, district judges may return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the statutory maximum and minimum."); Bowman, *supra*, at 182 ("Some have been tempted to read advisory to mean that the Guidelines are no longer legally binding on trial judges and that [they] are now merely useful suggestions to trial courts. However, a closer reading of the opinion suggests something quite different.... [Remedial *Booker*] strongly intimates that the guideline ranges produced by applying the rules to the facts continue to constrain judicial discretion."); D'Addio, *supra*, at 178 ("Justice Breyer's [Remedial *Booker*] opinion implies that reasonableness review will be more rigorous than simply determining whether the district courts checked the correct boxes."). Justice Scalia made the point more forcefully in his dissent to Remedial *Booker*. *See* 543 U.S. at 306–13, 125 S.Ct. 738. He wrote, "Even the most casual reading of this section [of Remedial *Booker*, which discusses appellate review,] discloses that its purpose—its only purpose—is to enable the courts of appeals to enforce conformity with the Guidelines.... If the Guidelines are no longer binding, one would think that the provision designed to ensure compliance with them would, in its totality, be inoperative." *Id.* at 306, 125 S.Ct. 738 (Scalia, J., dissenting in part). Therefore, the intimations of Remedial *Booker*, which conflict with the rule of Constitutional *Booker* more squarely than even its incongruous remedy, necessitate debates such as those in *Jimenez–Beltre*.[32]

---

**32.** *Cf. United States v. Zavala*, 443 F.3d 1165, 1170 (9th Cir.2006) ("[A] presumption at the district court would give undue weight to the Guidelines. The dangers averted by declaring them to be merely advisory would become recrudescent. Some might say that this is just semantics and that the same process will take place regardless of what we call it, but that is unduly cynical.").

Judge Gertner has explained the significance of this discussion with the psychological concept of "anchoring":

Anchoring is a strategy used to simplify complex tasks, in which "numeric judgments are assimilated to a previously considered standard." When asked to make a judgment, decision-makers take an initial starting value (i.e., the anchor) and then adjust it up or down. Studies underscore the significance of that initial anchor; judgments tend to be strongly biased in its direction. In effect, the 300–odd page Guideline Manual provides ready-made anchors. Gertner, *supra* note 4. Judge Lipez made the same point with a more philosophical tone in his *Jimenez–Beltre* dissent: "Word choices matter because they reflect mental processes, and mental processes matter because they

Judge McConnell has suggested that Remedial *Booker* could be viewed as "a pragmatic attempt by supporters of the Guidelines system, four of whom dissented from the Stevens majority, to patch together a workable sentencing system as close to the Guidelines as was possible under the circumstances. Responsibility for the inconsistency between violation and remedy, according to this theory, must lie with the remedial majority, which was unwilling to accede to the force of a Sixth Amendment holding with which they disagreed." McConnell, *supra*, at 679; *see also* M.K.B. Darmer, *The Federal Sentencing Guidelines after* Blakely *and* Booker: *The Limits of Congressional Tolerance and a Greater Role for Juries*, 56 S.C. L.Rev. 533, 564 (2005) ("While [Constitutional *Booker*] was a natural outgrowth of the Court's recent jurisprudence, [Remedial *Booker*] produced a jarring result in attempting to salvage as many current fea-

tures of the Guidelines as possible while effectuating an end-run around the Sixth Amendment requirements [Constitutional *Booker*] recognized."). Though Judge McConnell is judicious in his critique, suggesting that "this is not the whole story" and finding fault with Constitutional *Booker* as well, *id.*[33], all indications are that his initial criticism of Remedial *Booker* is precisely on point. Justice Stevens said as much in his dissent to Remedial *Booker*: "In reality, the majority's concerns ... are nothing more than an objection to *Apprendi* itself. ..." *Booker*, 543 U.S. at 288, 125 S.Ct. 738; *see also Ring v. Arizona*, 536 U.S. 584, 612, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) (Scalia, J., concurring) ("Justice Breyer ... refuses to accept *Apprendi* ....").[34] As a result, the Guidelines—and their judge-made factual findings—are still the driving force behind federal sentencing.[35] It must be so: "Reasonableness" has been defined in terms of the Guidelines.[36] *See* D'Addio, *supra*, at 192–94.

organize information for the decision-maker." *Jimenez–Beltre*, 440 F.3d at 530.

**33.** But see infra Part III.A.

**34.** *See also Harris v. United States*, 536 U.S. 545, 569, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002) (Breyer, J., concurring) ("I continue to believe that the Sixth Amendment permits judges to apply sentencing factors—whether those factors lead to a sentence beyond the statutory maximum (as in *Apprendi*) or the application of a mandatory minimum (as [in *Harris*])."); *Blakely*, 542 U.S. at 346, 124 S.Ct. 2531 (Breyer, J., dissenting) ("Taken together these three sets of considerations, concerning consequences, concerning history, and concerning institutional reliance, leave me where I was in *Apprendi, i.e.,* convinced that the Court is wrong.").

**35.** *See United States v. Crosby*, 397 F.3d 103, 110–11 (2d Cir.2005) ("*Booker/Fanfan* can be expected to have a significant effect on sentencing in federal criminal cases, although perhaps not as drastic an effect as some might suppose."). The Second Circuit has proved prescient. Nationwide, within-Guidelines sentences account for 62.6% of all *post-Booker* sentences, compared with only 72.2%

pre-*Blakely*. *U.S. Sentencing Commission Special Post-*Booker *Coding Project*, May 24, 2006, *at* http://www.ussc.gov/Blakely/post-Booker_052306.pdf. Adding in substantial assistance and other government-sponsored downward departures accounts for 85.9% of sentences post-*Booker*, compared to 94.1% pre-*Blakely*. Such differences hardly represent a radical change in federal sentencing.

**36.** The First Circuit is in the minority of circuits which does not give a within-Guidelines sentence a presumption of reasonableness. *See also United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir.2006); *United States v. Cooper*, 437 F.3d 324, 331–32 (3d Cir.2006); *United States v. Zavala*, 443 F.3d 1165, 1168–70 (9th Cir.2006). Even in these circuits, however, the Guidelines are given paramount consideration. *See, e.g., United States v. Rattoballi*, 452 F.3d 127, 133 (2d Cir.2006) (stating that non-Guidelines sentences would be viewed as "inherently suspect" on appellate review). Most circuits give even less weight to Constitutional *Booker* by starting with just such a presumption of reasonableness. *See United States v. Dorcely*, No. 05–3130, 454 F.3d 366, 376, 2006 WL 2034245, at *7 (D.C.Cir. July 21, 2006); *United States v. Johnson*, 445 F.3d

339, 341 (4th Cir.2006); *United States v. Kristl*, 437 F.3d 1050, 1054 (10th Cir.2006); *United States v. Williams*, 436 F.3d 706, 708 (6th Cir.2006); *United States v. Alonzo*, 435 F.3d 551, 554 (5th Cir.2006); *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir.2005); *United States v. Lincoln*, 413 F.3d 716, 717–18 (8th Cir.2005). Another circuit has simply said that a within-Guidelines sentence "ordinarily" would be reasonable. *See United States v. Talley*, 431 F.3d 784, 788 (11th Cir. 2005). No court of appeals has held a Guidelines sentence to be per se reasonable.

Additionally, the rule in many circuits, including the First, is that "the farther the judge's sentence departs from the guidelines sentence ..., the more compelling the justification based on factors in section 3553(a) that the judge must offer." *United States v. Dean*, 414 F.3d 725, 729 (7th Cir.2005); *see Smith*, 445 F.3d at 4 (quoting *Dean* ); *United States v. Smith*, 440 F.3d 704, 707 (5th Cir.2006) (same); *Lazenby*, 439 F.3d at 932; *United States v. McMannus*, 436 F.3d 1177, 1187 n. 10 (8th Cir.2006).

The reason most circuits give for applying this presumption is that the Guidelines are the only Section 3553(a) factor which accounts for all the others. *See United States v. Terrell*, 445 F.3d 1261, 1265 (10th Cir. 2006); *United States v. Johnson*, 445 F.3d 339, 342–43 (4th Cir.2006); *Jimenez–Beltre*, 440 F.3d at 518; *Mykytiuk*, 415 F.3d at 607; *United States v. Lazenby*, 439 F.3d 928, 932 (8th Cir.2006); *see also Cooper*, 437 F.3d at 331. This position comports with the Sentencing Commission's pronouncements. *See* Prepared Statement of Hon. Ricardo H. Hinojosa, Chair, U.S. Sentencing Commission before the House Judiciary Committee, Mar. 16, 2006, at 2 ("During the process of developing the initial set of guidelines and refining them throughout the ensuing years, the Commission has considered the very factors listed at section 3553(a) that were cited with approval in *Booker* .... In short, sentencing courts should give substantial weight to the Federal Sentencing Guidelines as they are the product of years of careful study and represent the integration of multiple sentencing factors." (footnotes omitted)), *at* http://www.ussc.gov/booker_report/03_16_06Booker"Testimony.pdf. The position of the Commission in this regard has been sharply criticized. *See* Gertner, *supra* note 4 ("Now, post-*Booker*, it is, as Yogi Berra would say, déjà vu all over again. The Commission sings the same tune—sentencing uniformity above all else. It could

have announced a plan to generate more studies about efficacy, deterrence, or crime control to inform Guideline development as well as guide judges' *Booker* discretion. It could have provided new, detailed findings to encourage a more nuanced Guideline interpretation. It did not. Instead, it has announced—*ipse dixit*—that the Guidelines already embody all purposes of sentencing, and has thrown its influence behind the 'Guidelines-as-presumptively-reasonable' camp.");

Though the presumption is purportedly rebuttable, as of July 31, 2006, the Sentencing Law and Policy Blog kept by Professor Douglas A. Berman of The Ohio State University Moritz College of Law (http://www.sentencing.typepad.com), and which reports in near-realtime on *Booker* and other sentencing issues, had noted only a single case in which a within-Guidelines sentence was reversed as unreasonable. *Lazenby*, 439 F.3d at 933 (reversing sentence based comparison to co-defendant's sentence); *see also United States v. Carty*, 453 F.3d 1214 (9th Cir.2006) (reversing sentence where judge failed to provide adequate explanation of within-Guidelines sentence); *United States v. Vonner*, 452 F.3d 560 (6th Cir.2006) (same); *see also* Eric Citron, *Sentencing Review: Judgment, Justice, and the Judiciary*, Yale L.J. (The Pocket Part), July 2006, http://www.thepocketpart.org/2006/07/citron.html ("[O]ne can comb through mountains of case law from any circuit before finding a within-Guidelines sentence reversed as unreasonable."). Affirmances of the same were "[f]ar too many to list". *See Cooper*, 437 F.3d at 331 ("[I]t is less likely that a within-guidelines sentence, as opposed to an outside-guidelines sentence, will be unreasonable"); *United States v. Mares*, 402 F.3d 511, 519 (5th Cir.2005) ("[I]t will be rare for a reviewing court to say [a within-Guidelines sentence] is 'unreasonable.' ").

Perhaps more disturbing is the trend becoming evident that circuit courts more frequently reverse below-Guidelines sentences than above-Guidelines sentences. *See* Sentencing Law and Policy Blog, July 31, 2006 (noting—in an admittedly noncomprehensive list—39 cases of the former, but only 4 cases of the latter); *see also* U.S. Sentencing Commission, *Final Report on the Impact of United States v. Booker On Federal Sentencing* 30 (Mar.2006), *available at* http://www.ussc.gov/booker_report/Booker_Report.pdf (exhibiting same trend); *United States v. Meyer*, 452 F.3d 998, 1001 n. 3 (8th Cir.2006) (Heaney, J., for

Nobody doubts that Remedial *Booker* contemplated just that. Neither should anyone doubt, however, that such a scheme violates the rule of Constitutional *Booker*. "[T]o the degree that 'reasonableness' cabins discretion, the Sixth Amendment problem resurfaces." *Id.* at 192. Even Justice Breyer recognized that appellate restrictions on judicial discretion could offend *Apprendi* and *Blakely*. *Booker,* 543 U.S. at 332–33, 125 S.Ct. 738 (Breyer, J., dissenting). He quickly stated in conclusory fashion, though, that "[a]ppellate courts' efforts to define the limits of the 'reasonable' of course would fall outside *Blakely's* scope." *Id.* at 333, 125 S.Ct. 738; *see* D'Addio, *supra,* at 190–92. In this in-

stance, Justice Breyer's reasoning is more persuasive than his conclusion.

Justice Scalia warned that "the remedial majority[ ] ... may lead some courts of appeals to conclude—may indeed be *designed* to lead courts of appeals to conclude—that little has changed." *Id.* at 311–12, 125 S.Ct. 738 (emphasis added). He questioned whether "appellate review for 'unreasonableness' preserved *de facto* mandatory Guidelines by discouraging district courts from sentencing outside Guidelines ranges". *Id.* at 313, 125 S.Ct. 738.[37]

Does anyone now doubt that Justice Scalia was correct?

himself) (reviewing the same trend in the Eighth Circuit). This trend is strikingly similar to circuit court review of upward and downward departures under the "mandatory Guidelines" regime and lends an interesting perspective on Justice Breyer's reference to "the past two decades of appellate practice in cases involving departures" as he instructed circuit courts on what "reasonableness" review under the "advisory Guidelines" was to be. *Booker,* 543 U.S. at 261, 125 S.Ct. 738.

One might argue that "[p]roperly understood ..., reasonableness ... is primarily an appellate, not a trial court device. '[A] district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a). Reasonableness is an *appellate* standard of review in judging whether a district court has accomplished its task.'" *United States v. Buchanan,* 449 F.3d 731, at 740 (6th Cir.2006) (Sutton, J., concurring) (third alteration in original) (quoting *United States v. Foreman,* 436 F.3d 638, 644 n. 1 (6th Cir.2006)). Can it seriously be argued, though, that appellate standards of review do not or should not influence a sentencing court's use of its discretion?

**37.** Circuit courts are not the only source of pressure on sentencing judges to follow the Guidelines. Among the provisions of the widely criticized Feeney Amendment to the PROTECT Act, *see Green,* 346 F.Supp.2d at 283–89, was a requirement that sentencing

judges report to the Commission their reasons for departing downward from the recommended Guidelines sentence. *See* Pub.L. No. 108–21, § 401, Stat. 650, 657 (2003). This Court's own experience with the reporting requirement is recounted in its *Green* opinion. 346 F.Supp.2d at 332 n. 388. Remedial *Booker* did not affect this meddling mandate.

As if that were not enough, one provision of the recently renewed USA PATRIOT Act requires judges to report their reasons for downwardly departing on a common form whose format is approved by the Commission. Pub.L. No. 109–177, § 735, 120 Stat. 192, 271 (2006). The Judgment and Commitment Order (form AO 245B) is now used for this purpose. *See infra* note 76. The form takes much less effort to complete if the sentencing judge has sentenced within the Guidelines range, providing convenient boxes to check if the judge issues a within-Guidelines sentence, but requiring an essay if she does not. In addition, as Judge Gertner has pointed out, the Commission periodically releases statistics on district court "conformance" with the Guidelines. Gertner, *supra* note 4.

I believe that judges strive faithfully to maintain their independence in these matters, but in the face of such pressure—both subtle and no-so-subtle—it is, no doubt, becoming more difficult. *See Kirsch,* 287 F.Supp.2d at 1006–07 (Magnuson, J.) ("[T]he Court is intimidated, and the Court is scared to depart.").

## D. The Real Dispute

As did the Sentencing Reform Act, Remedial *Booker* purports to be concerned most with uniformity in criminal sentencing. *See, e.g., Booker*, 543 U.S. at 250, 125 S.Ct. 738 (calling "a system that diminishes sentencing disparity" one of "Congress'[s] basic statutory goal[s]"); *id.* at 255, 125 S.Ct. 738 ("Congress enacted the sentencing statutes in major part to achieve greater uniformity in sentencing . . . ."). One wonders, then, how removing the provision that makes the Guidelines mandatory for all judges promotes the goal of uniformity. Justice Scalia noted that it was "wonderfully ironic" that "[i]n order to rescue from nullification a statutory scheme designed to eliminate discretionary sentencing, [Remedial *Booker* ] discarded the provisions that eliminate discretionary sentencing." *Id.* at 304, 125 S.Ct. 738 (Scalia, J., dissenting in part).[38]

According to Justice Breyer, this criticism missed the point. When Congress sought "to move the sentencing system in the direction of increased uniformity", it (oddly) did not mean "uniformity" in the sense of "similar sentences for those convicted of the same statute". *Booker*, 543 U.S. at 253, 125 S.Ct. 738. The uniformity that mattered consisted "more importantly[ ] of similar relationships between sentenced and real conduct". *Id.* at 254, 125 S.Ct. 738.[39]

From this premise, Remedial *Booker* proceeded to the solution announced. It eschewed the notion that a jury could determine the *"real conduct* that underlies the crime of conviction", which was "Congress'[s] basic statutory goal". *Id.* at 250, 125 S.Ct. 738. The Guidelines were too

---

**38.** Many, including the dissenting Justices in *Apprendi*, have accused the Supreme Court's recent Sixth Amendment jurisprudence regarding trial by jury of "invalidat[ing] . . . three decades' worth of nationwide [sentencing] reform", which strove for increased uniformity in criminal sentences. *Apprendi*, 530 U.S. at 550, 120 S.Ct. 2348 (O'Connor, J., dissenting). In reaction to *Booker*—and the downward departures from the Guidelines it authorized judges to give—Congress is gearing up to pass new, likely harsher sentencing legislation. *See* Press Release, Representative F. James Sensenbrenner, Sensenbrenner Expresses Concern Over Federal Sentencing Practices Detailed in New Report (Mar. 14, 2006), *available at* http://rele ases.usnewswire.com/GetRelease.asp?id=62345.

Contrary to many accusations, *see, e.g., Blakely*, 542 U.S. at 326, 124 S.Ct. 2531 (O'Connor, J., dissenting) ("What I have feared most has now come to pass: Over 20 years of sentencing reform are all but lost . . . ."), this reaction was not the necessary consequence of *Apprendi* and *Blakely*. It was Remedial *Booker* that exalted a "judge-based sentencing system", 543 U.S. at 265, 125 S.Ct. 738, over a rule that would have kept the existing mandatory system intact, adding only a requirement that the jury find the nec-essary Guidelines facts. "[Remedial *Booker* ] was not the inevitable result of the [Supreme] Court's holding that *Blakely* applies to the Guidelines. Neither *Apprendi*, nor *Blakely*, nor *[Booker]* made determinate sentencing unconstitutional." *Booker*, 543 U.S. at 301, 125 S.Ct. 738 (Stevens, J., dissenting in part); *cf. Blakely*, 542 U.S. at 308, 124 S.Ct. 2531 ("This case is not about whether determinate sentencing is constitutional, only about how it can be implemented in a way that respects the Sixth Amendment."). Make no mistake: For ill or good, it is Remedial *Booker*—the work of *Apprendi* and *Blakely critics*—that has created the current status of federal sentencing.

**39.** In Remedial *Booker*, Justice Breyer did not mention that the "real conduct" focus of the Guidelines—as opposed to "charged conduct"—was a policy choice not of Congress, but of *the Sentencing Commission* (on which then-Judge Breyer sat). *See* U.S.S.G. § 1A1.1 (Editorial Note) (calling the choice between a "real offense" system and a "charge offense" system "[o]ne of the most important questions for *the Commission* to decide" (emphasis added)). Though Congress subsequently approved of the Commission's system, the Act itself did not mandate the Guidelines' emphasis on "real conduct".

complex for juries to administer in a way that achieved this notion of uniformity, claimed the Remedial *Booker* majority as it posed a series of hypothetical defendants and crimes. *See id.* at 253–55, 125 S.Ct. 738. "How would a jury measure 'loss' in a securities fraud case—a matter so complex as to lead the Commission to instruct judges to make 'only ... a reasonable estimate'?" *Id.* at 255, 125 S.Ct. 738 (citing U.S.S.G. § 2B1.1, comment (n.3(C))). No, it said, the system is "judge-based", *Booker*, 543 U.S. at 268, 125 S.Ct. 738; requiring the jury to administer the Guidelines would not comport with goals of the Sentencing Reform Act, *id.* at 249–50, 125 S.Ct. 738. "[T]he constitutional jury trial requirement is not compatible with the Act as written...." *Id.* at 248, 125 S.Ct. 738.

Remedial *Booker* argued that if a jury requirement were "engraft[ed]" onto the Guidelines it would "weaken the tie between a sentence and an offender's real conduct." 543 U.S. at 252, 125 S.Ct. 738. "The other approach, which we now adopt, would (through severance and excision of two provisions) make the Guidelines system advisory while maintaining a strong connection between the sentence imposed and the offender's real conduct—a connection important to the increased uniformity of sentencing that Congress intended its Guidelines system to achieve." *Id.* at 246, 125 S.Ct. 738.

Justice Breyer is surely correct that a charge-offense system would certainly impede the Guidelines' version of "real conduct" sentencing [40]; but "increasing a defendant's sentence on the basis of conduct not proved at trial[ ]is contrary to the very core of *Apprendi.*" *Id.* at 288, 125 S.Ct. 738 (Stevens, J., dissenting in part). *Apprendi* mandated that, rather than the "real conduct" of the defendant, a sentence must be tied to the *jury verdict. See Apprendi*, 530 U.S. at 482, 120 S.Ct. 2348 (speaking of "[t]he historic link between verdict and judgment"); *see also Blakely*, 542 U.S. at 306, 124 S.Ct. 2531 (*"Apprendi* carries out th[e] [constitutional] design by ensuring that the judge's authority to sentence derives wholly from the *jury's verdict.*" (emphasis added)); *id.* at 303, 124 S.Ct. 2531 ("Our precedents make clear ... that the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the* jury verdict *or admitted by the defendant.*" (some emphasis added)). Justice Stevens, in his dissent to Remedial *Booker*, made this very point: "The [remedial] majority is correct ... that my preferred holding would undoubtedly affect 'real conduct' sentencing in certain cases. This is so because the goal of such sentencing—increasing a defendant's sentence on the basis of conduct not proved at trial—is contrary to the very core of *Apprendi.*" *Booker*, 543 U.S. at 288, 125 S.Ct. 738.

Justice Breyer's views were not new to him in *Booker.* Remedial *Booker* was simply the first time he could scrape together a majority of his colleagues to support it. In *Apprendi*, Justice Breyer had complained that the rule announced in that case "would seem to promote a procedural ideal—that of juries, not judges, determining the existence of those facts upon which increased punishment turns. But the real world of criminal justice cannot hope to meet any such ideal." 530 U.S. at 555, 120 S.Ct. 2348 (Breyer, J., dissenting). His dissent in *Blakely* likewise raised the issue: "How are juries to deal with highly complex or openended Sentencing Guidelines obviously written for application by

---

**40.** "Real conduct" sentencing, of course, would be entirely constitutional if the facts that the law made relevant to a defendant's "real conduct" were proven to a jury beyond a reasonable doubt. *See supra* note 38.

an experienced trial judge?" 542 U.S. at 346–47, 124 S.Ct. 2531.

As the Supreme Court has itself noted, "Justice Breyer's more general argument-that *Apprendi* undermines alternatives to adversarial factfinding [i.e., judicial factfinding]—is not so much a criticism of *Apprendi* as an assault on jury trial generally." *Blakely,* 542 U.S. at 312–13, 124 S.Ct. 2531. The Court has repeatedly refuted the premise from which Justice Breyer advances. "Our Constitution and the common-law traditions it entrenches ... do not admit of the contention that facts are better discovered by judicial inquisition than by adversarial testing before a jury. Justice Breyer may be convinced of the equity of the regime he favors, but his views are not the ones we are bound to uphold." *Id.* at 313, 124 S.Ct. 2531 (citation omitted). Justice Scalia had further expounded on this theme in his *Apprendi* concurrence:

> [Justice Breyer] sketches an admirably fair and efficient scheme of criminal justice designed for a society that is prepared to leave criminal justice to the State. . . . The founders of the American Republic were not prepared to leave it to the State, which is why the jury-trial right was one of the least controversial provisions of the Bill of Rights. It has never been efficient; but it has always been free.

As for fairness, which Justice Breyer believes "in modern times" the jury cannot provide: I think it not unfair to tell a prospective felon that if he commits his contemplated crime he is exposing himself to a jail sentence of 30 years. . . .

> In Justice Breyer's bureaucratic realm of perfect equity, by contrast, the facts that determine the length of sentence to which the defendant is exposed will be determined to exist (on a more-likely-than-not basis) by a single employee of the State. It is certainly arguable (Justice Breyer argues it) that this sacrifice of prior protections is worth it. But it is not arguable that, just because one thinks it is a better system, it must be, or even is more likely to be, the system envisioned by a Constitution that guarantees trial by jury.

530 U.S. at 498, 120 S.Ct. 2348 (citation omitted). "We have always trusted juries to sort through complex facts in various areas of law. This may not be the most efficient system imaginable, but the Constitution does not permit efficiency to be our primary concern." *Booker,* 543 U.S. at 289, 125 S.Ct. 738 (Stevens, J., dissenting in part). "The Framers would not have thought it too much to demand that, before depriving a man of three more years of his liberty, the State should suffer the modest inconvenience of submitting its accusation to 'the unanimous suffrage of twelve of his equals and neighbours' rather than a lone employee of the State." *Blakely,* 542 U.S. at 313–14, 124 S.Ct. 2531 (citation omitted).

## III. The Constitutional Mandate

That our laws routinely require a defendant's sentence to be based upon what a judge believes an offender "really" did, as opposed to the actual crime of which he was convicted by the jury, is nothing less than offensive—let alone unconstitutional.[41] "The notion that a defendant's sen-

41. A recent, appalling example is found in an unpublished, *per curiam* opinion of the Eighth Circuit. *United States v. Rashaw,* 170 Fed. Appx. 986 (8th Cir.2006). Rashaw had been convicted "on two counts of being a felon in possession of a firearm and of one count of possessing an unregistered firearm." *Id.* at 986. The district court in calculating the Guidelines, however, set the Guidelines offense level based on "evidence" that Rashaw had, in another incident and with another gun, committed a double murder. Rashaw had never been charged with these crimes, much less convicted. *Id.* The resulting Guidelines range being higher than the statutory maximum, the court sentenced Rashaw to three *consecutive* ten-year terms. *Id.* The

tence is based upon his 'real offense' ... begs the question: 'real' according to whom, and according to what standard." *Darmer*, supra, at 544. In truth, "real conduct" sentencing as embodied in the Guidelines, is simply punishment for acts not constitutionally proven.[42] The system relies on "findings" that rest on "a mish-mash of data[,] including blatantly self-serving hearsay largely served up by the Department [of Justice]." *Green*, 346 F.Supp.2d at 280.[43] If the Sentencing Reform Act "depends for its success upon judicial efforts to" administer this scheme and its faux findings, then the Act's success ought not be desired. *See Jones*, 526 U.S. at 252 n. 11, 119 S.Ct. 1215 (Souter, J., for the Court) ("[I]t should go without saying that, if [sentencing] policies conflict with safeguards enshrined in the Constitution for the protection of the accused, those policies have to yield to the constitutional guarantees."). A fundamental premise of our Constitution is that it is not what one "really" does that can be punished, but only that conduct which is prov-

en at trial. The mandate of the United States Constitution is simple and direct:

> If the law identifies a fact that warrants deprivation of a defendant's liberty or an increase in that deprivation, such fact must be proven to a jury beyond a reasonable doubt.

*See* U.S. Const. art. III. § 2, cl. 3.

This rule has been articulated by the Supreme Court in essentially the same formula for over a century. *See Davis v. United States*, 160 U.S. 469, 493, 16 S.Ct. 353, 40 L.Ed. 499 (1895) ("No man should be deprived of his life under the forms of law unless the jurors who try him are able, upon their consciences, to say that the evidence before them ... is sufficient to show beyond a reasonable doubt the existence of every fact necessary to constitute the crime charged." (Harlan, J., for a unanimous Court)); *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) ("[W]e explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact nec-

---

Eighth Circuit affirmed this sentence as reasonable. *Id.*

The disposition of *Rashaw* is scandalous and shameful. Justice Scalia, for the majority of the Supreme Court, had written in *Blakely* of an eerily similar *hypothetical* when making a *reductio ad absurdum* argument refuting "[t]hose who would reject *Apprendi*". *Blakely*, 542 U.S. at 306, 124 S.Ct. 2531. That such an appalling result can be "reasonable" under Remedial *Booker* speaks volumes about the perversity of that decision in specific and of "real conduct" sentencing in general.

42. Dan Markel, "The Indispensable Berman on *Booker*", June 26, 2006, PrawfsBlawg, *at* http://prawfsblawg.blogs.com/prawfsblawg/2006/06/the_indispensab.html ("For what is real conduct in a regime in which the Founders sought the use of juries except conduct that has either been admitted to or been included in the indictment and proved to be 'real' beyond a reasonable doubt by a jury of one's peers?").

43. Dan Markel, *supra* note 42 ("[W]hat makes the *Booker* remedy fundamentally untenable is *that it continues to provide safe harbor for the* imaginative fantasies of what really occurred under the rubric of real conduct."); *see also Booker*, 543 U.S. at 304, 125 S.Ct. 738 (Scalia, J., dissenting in part) (relating that judges "determine 'real conduct' on the basis of bureaucratically prepared, hearsay-riddled presentence reports"); *Blakely*, 542 U.S. at 312, 124 S.Ct. 2531 (addressing the unfairness of basing a defendant's sentence "on facts extracted after trial from a report compiled by a probation officer who the judge thinks more likely got it right than got it wrong"). The Federal Public Defenders report that "[m]any (according to the Commission) or nearly all (in our experience) probation officers incorporate the prosecutor's written version of the facts or law enforcement reports directly into the [pre-sentence report]." Letter from Jon. M Sands, *supra* note 4, Memorandum at 21. Moreover, the Commission's own studies show wild inconsistencies in how probation officers evaluate "real conduct". *Id.* at 23.

essary to constitute the crime with which he is charged."); *Apprendi*, 530 U.S. at 490, 120 S.Ct. 2348 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."); *Ring*, 536 U.S. at 602, 122 S.Ct. 2428 ("If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt.").

The rule has three essential components: (1) every fact necessary to punishment; (2) proved to a jury; (3) beyond a reasonable doubt. Although the history and significance of every component has been reviewed thoroughly by each significant case on this issue, the importance of grasping these fundamental concepts has never been greater—nor their recognition less secure. I feel impelled to write a few lines to address them yet again.

## A. Every Fact Necessary to Punishment

"The law threatens certain pains if you do certain things, intending thereby to give you a new motive for not doing them. If you persist in doing them, it has to inflict the pains in order that its threats may continue to be believed." Oliver Wendell Holmes, Jr., *The Common Law* 46 (Dover ed.1991). It follows from this that in order constitutionally to inflict those "pains", the government must prove that one actually did those "things". Anything less would make a farce of Due Process. As Blackstone wrote,

[T]he founders of the English laws have with excellent forecast contrived, that no man should be called to answer to the king for any capital crime, unless upon the preparatory accusation of twelve or more of his fellow subjects, the grand jury: and that *the truth of every accusa-*

*tion*, whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by the unanimous suffrage of twelve of his equals and neighbours, indifferently chosen, and superior to all suspicion.

4 Blackstone, *Commentaries on the Laws of England* 343 (1769) (emphasis added). This principle was recognized in an important aspect of the Supreme Court's decision in *In re Winship*, which applied its holding requiring proof beyond a reasonable doubt to "every fact necessary to constitute the crime". 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

The Court's first ruling on the scope of that statement came in *Mullaney v. Wilbur* and took a broad, functional view of the matter. 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). Maine law defined "murder" as "kill[ing] a human being with malice aforethought". *Id.* at 686 & n. 3. The law provided a conclusive presumption of malice once the other elements were proven, unless the defendant proved by a preponderance of the evidence that he had acted in the heat of passion, which would reduce the offense to manslaughter. *Id.* The Supreme Court ruled that this scheme violated Due Process.

[T]he criminal law of Maine ... is concerned not only with guilt or innocense in the abstract but also with the degree of criminal culpability. Maine has chosen to distinguish those who kill in the heat of passion from those who kill in the absence of this factor. Because the former are less blameworthy, they are subject to substantially less severe penalties. By drawing this distinction, while refusing to require the prosecution to establish beyond a reasonable doubt the fact upon which it turns, Maine denigrates the interests found critical in *Winship*.

*Id.* at 697–98, 95 S.Ct. 1881 (alteration, citation, and internal quotation marks

omitted). "If *Winship* were limited to those facts that constitute a crime as defined by state law, a State could undermine many of the interests that decision sought to protect without effecting a substantive change in its law." *Id.* at 698, 95 S.Ct. 1881. *"Winship* is concerned with substance rather than this kind of formalism." *Id.* at 699, 95 S.Ct. 1881.

The robust protections affirmed in *Mullaney,* however, were somewhat circumscribed two years later in *Patterson v. New York.* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977). New York's homicide statute was similar to Maine's. It defined "murder" as "intentionally causing the death of anther person", *see id.* at 198, 97 S.Ct. 2319, but provided a separate affirmative defense for those who "acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse." *Id.* Thus, the only difference between Maine's statute and New York's was that Maine's definition of murder included "malice" and New York's did not; New York did not employ a "presumption of malice" because malice was not part of the crime.

This distinction was significant to the Supreme Court. "The death, the intent to kill, and causation are the facts that the State is required to prove beyond a reasonable doubt if a person is to be convicted of murder. No further facts are presumed or inferred in order to constitute the crime." *Id.* at 205–06, 97 S.Ct. 2319. "The State itself was unwilling to undertake to establish the absence of [heat of passion] beyond a reasonable doubt...." *Id.* at 207, 97 S.Ct. 2319. "This view may seem to permit state legislatures to reallocate burdens of proof by labeling as affirmative defenses at least some elements of the crimes now defined in their statutes. But there are obviously constitutional limits beyond which the States may not go." *Id.* at 210, 97 S.Ct. 2319. The Court limited *Mullaney's* holding, saying that it "should not be so broadly read" as to prohibit "the blameworthiness of an act or the severity of punishment authorized for its commission to depend on the presence or absence of an identified fact without assuming the burden of proving the presence or absence of that fact, as the case may be, beyond a reasonable doubt." *Id.* at 214, 97 S.Ct. 2319. The Court added that though "[t]here is language in *Mullaney* that has been understood as perhaps construing the Due Process Clause to require the prosecution to prove beyond a reasonable doubt any fact affecting the degree of criminal culpability[,] ... [t]he Court did not intend *Mullaney* to have such far-reaching effect." *Id.* at 214 n. 15, 97 S.Ct. 2319 (internal quotation marks and citation omitted).

The significant protections of *Winship* and *Mullaney,* then, were to be had only when the criminal code was constructed in such a way as to permit it. This might not have been such a problem had criminal sentencing ossified around 1977 criminal codes. Up to that point, all of the facts which the law identified as significant to punishment, whether part of the affirmative case or part of the defense, had been the subject of the trial and found by the jury to exist or not. In England, pre-revolutionary America, and for some time after our founding, the sentence imposed by the judge largely was non-discretionary and derivative wholly from the fact of conviction itself. Toward the end of the nineteenth century, however, as rehabilitation became the primary objective of criminal justice, legislatures granted more discretion to judges (and to the executive through parole boards) to determine the exact length of a convicted defendant's sentence. Importantly, the limits of such discretion always were fixed by statute. Even in this discretionary system, the existence of facts necessary to the punishment provided by law were to be found in the very nature of the jury verdict.

In 1984, to rectify the disparity in sentences that had resulted from unchecked judicial and executive discretion, Congress passed the Sentencing Reform Act. Pub.L. No. 98–473, 98 Stat. 1837 (codified as amended at 18 U.S.C. § 3551 *et seq.*). In addition to abolishing parole in the federal system, the Act also established the U.S. Sentencing Commission, whose primary mission was to create sentencing guidelines. The most significant feature of the Guidelines, as promulgated, was the many "sentencing factors" it established. These "factors" were the attempted codification of all those (legitimate) considerations that judges had used for decades when exercising their discretion in determining the length of a criminal sentence. As noted previously, Guidelines "factors" were to be found by the judge—after the jury verdict—and a sentence within the narrow range established by the Guidelines (and based on those findings) was essentially mandatory.[44]

The first case to consider the constitutionality of a sentencing scheme congruous with the Guidelines in important respects was *McMillan v. Pennsylvania.* 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986). In *McMillan*, the Supreme Court considered the implications of Pennsylvania's provision for a mandatory minimum sentence for a convicted felon if "the person 'visibly possessed a firearm' during the commission of the offense." *Id.* at 81, 106 S.Ct. 2411 (citation omitted). Like the federal Guidelines, the fact of visible possession was to be found by the judge, after conviction, by a preponderance of the evidence. *Id.* McMillan challenged the procedure under the Due Process Clause as explicated in *Winship* and *Mullaney.*

Rejecting the challenge, the Supreme Court relied on *Patterson.* That case, said the Court, stood for the proposition that "the state legislature's definition of the elements of the offense is usually dispositive." *Id.* at 85, 106 S.Ct. 2411. In the Pennsylvania statute, "the Pennsylvania Legislature has expressly provided that visible possession of a firearm is not an element of the crimes enumerated in the mandatory sentencing statute, but instead is a sentencing factor." *Id.* at 85–86, 106 S.Ct. 2411 (citation omitted). It was here that the Court first identified-and validated—these extra—verdict facts as "sentencing factors", to be distinguished from "elements" of a crime. Laws such as Pennsylvania's "operate[ ] solely to limit the sentencing court's discretion in selecting a penalty within the range already available to it without the special finding". *Id.* at 88, 106 S.Ct. 2411. As to *Patterson's* "constitutional limits beyond which the States may not go", *Patterson,* 432 U.S. at 210, 97 S.Ct. 2319, "the [Pennsylvania statute at issue in *McMillan* ] gives no impression of having been tailored to permit the visible possession finding to be *a tail which wags the dog of the substantive offense." McMillan,* 477 U.S. at 88, 106 S.Ct. 2411 (emphasis added). And with that, the constitutional "limits" [45] on the scope of "sentencing factors" were set.

---

44. *See generally* Ilene H. Nagel, *Structuring Discretion: The New Federal Sentencing Guidelines,* 80 J.Crim. L. & Criminology 883 (1990).

45. Justice Scalia later impugned this "standard" in a most-amusing footnote. *Blakely,* 542 U.S. at 311 n. 13, 124 S.Ct. 2531 ("The source of this principle [that tail shall not wag dog] is unclear. Its precise effect, if precise effect it has, is presumably to require that the ratio of sentencing-factor add-on to basic criminal sentence be no greater than the ratio of caudal vertebrae to body in the breed of canine with the longest tail. Or perhaps no greater than the average such ratio for all breeds. Or perhaps the median. Regrettably, *Apprendi* has prevented the full development of this line of jurisprudence.").

The significant proposition of *McMillan* was that legislatures could define "elements" of crimes and "sentencing factors" largely as they wished. The practical effect of endorsing this practice was to create a trial and sentencing procedure which separated the lawful punishment from the jury verdict. Unlike *Mullaney* and even *Patterson,* the sentence imposed with schemes like that in *McMillan* was now dependent not on the facts as found in the verdict, but on facts later found by the judge. Such a process forfeits significant constitutional protections for criminal defendants in the finding of material facts, including a sufficient standard of proof and jury fact-finding. Though supporters of *McMillan* would one day accuse the proponents of *Apprendi* of engaging in "meaningless formalism", *Apprendi,* 530 U.S. at 539, 120 S.Ct. 2348 (O'Connor, J., dissenting), it is actually *McMillan* that hews the formalistic line.[46] Under its rule, legislatures easily could draft their way around constitutional protections by declaring relevant facts to be "sentencing factors" instead of "elements" of a crime. Protection like that is no protection at all.

It was fourteen years before the "historic link between verdict and judgment", *Apprendi,* 530 U.S. at 482, 120 S.Ct. 2348, began to be restored. In *Apprendi,* the Court returned to its early functional approach regarding relevant facts: "Despite what appears to us the clear 'elemental' nature of the [sentencing] factor here, the relevant inquiry is not one of form, but of effect—does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" *Id.* at 494, 120 S.Ct. 2348. Citing *Winship* and *Mullaney* approvingly, the Court resurrected the language of

*Mullaney* that *Patterson* had rejected: "Since *Winship,* we have made clear beyond peradventure that *Winship's* due process and associated jury protections extend, to some degree, 'to determinations that [go] not to a defendant's guilt or innocense, but simply to the length of his sentence.' This was the primary lesson of *Mullaney.*" *Id.* at 484, 120 S.Ct. 2348 (quoting *Almendarez-Torres,* 523 U.S. at 251, 118 S.Ct. 1219 (Scalia, J., dissenting)). "Criminal law 'is concerned not only with guilt or innocense in the abstract, but also with the degree of criminal culpability' assessed." *Id.* at 485, 120 S.Ct. 2348 (quoting *Mullaney,* 421 U.S. at 697–98, 95 S.Ct. 1881).[47]

*Patterson* and *Mullaney* were not necessarily contradictory in this regard—only *McMillan's* broad reading of Patterson (later endorsed by the *Apprendi* dissenters) made it so. In both cases, all the facts the law deemed essential to guilt and punishment had been decided by the jury and were represented in the verdict. *See id.* at 485 n. 12, 120 S.Ct. 2348. Throwing cold water on *McMillan,* the Court limited its holding "to cases that do not involve the imposition of a sentence more severe than the statutory maximum for the offense established by the jury's verdict—a limitation identified in the *McMillan* opinion itself.... [W]e reserve for another day the question of whether *stare decisis* considerations preclude reconsideration of its narrower holding." *Id.* at 487 n. 13, 120 S.Ct. 2348. The Court did not "suggest that the term 'sentencing factor' is devoid of meaning. The term appropriately describes a circumstance ... that supports a specific sentence *within the range* authorized by the jury's finding that the defendant is

---

**46.** *Cf. Mullaney,* 421 U.S. at 699, 95 S.Ct. 1881 ("*Winship* is concerned with substance rather than this kind of formalism.").

**47.** Justice O'Connor recognized—and lamented—the reinvigoration of *Winship* and *Mullaney* in her *Apprendi* dissent. 530 U.S. at 531–32, 120 S.Ct. 2348.

guilty of a particular offense." *Id.* at 494 n. 19, 120 S.Ct. 2348.

This aspect of *Apprendi* caused the most consternation for the dissenting Justices. Justice Breyer wondered, if there was "no objection to traditional pre-Guidelines sentencing procedures under which judges, not juries, made the factual findings that would lead to an increase in an individual offender's sentence", why "legislative determination[s] differ[ed] in any significant way[.]" *Id.* at 561, 120 S.Ct. 2348 (Breyer, J., dissenting). Justice O'Connor expressed the same sentiment:

> Under our precedent ..., a State may leave the determination of a defendant's sentence to a judge's discretionary decision within a prescribed range of penalties. When a judge, pursuant to that sentencing scheme, decides to increase a defendant's sentence on the basis of certain contested facts, those facts need not be proved to a jury beyond a reasonable doubt. The judge's findings, whether by proof beyond a reasonable doubt or less, suffice for the purposes of the Constitution. Under [*Apprendi*], however, it appears that once a legislature constrains judges' sentencing discretion by prescribing certain sentences that may only be imposed (or must be imposed) in connection with the same determinations of the same contested facts instead be proved to a jury beyond a reasonable doubt. I see no reason to treat the two schemes differently.

*Id.* at 546, 120 S.Ct. 2348 (O'Connor, J., dissenting). Judge McConnell has identified this apparent anomaly as contributing to the contradiction of *Booker.* *See* McConnell, *supra,* at 679–80.

The dissenters missed the key point, however—or refused to accept it. The *law* sets the *range* of available punishment. The facts relevant to constitutional protections are those which the law says stake out the bookends of this range, not those facts which the judge might consider in the exercise of his discretion within the range. "We have often noted that judges in this country have long exercised discretion of this [latter] nature in imposing sentence *within statutory limits." Apprendi,* 530 U.S. at 481, 120 S.Ct. 2348 (citing *Williams v. New York,* 337 U.S. 241, 246, 247, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949)).[48] Legislatures are free to set those limits where they like—even to create a determinate, "real conduct" sentencing scheme, *see Blakely,* 542 U.S. at 308, 124 S.Ct. 2531—but "[t]he historic link between verdict and judgment" constrains the judge's role in sentencing at its outer limits, *id.* at 482–83 & n. 10, 120 S.Ct. 2348. The facts deemed relevant by the law must be reflected in the verdict. *See id.* at 481–82 & nn. 9–10, 120 S.Ct. 2348; *id.* at 478–79, 120 S.Ct. 2348 ("[A]fter the verdict ..., 'the court *must pronounce judgment, which the law hath annexed to the crime.*'" (emphasis added by the Supreme Court) (quoting 4 Blackstone, *supra,* at 369–70)). *Blakely* only clarified this point further. Its key holding—the one that made certain the unconstitutionality of the federal Guidelines—was that "the relevant 'statutory maximum' is not the maximum sentence a judge may impose *after* finding additional facts, but the maximum he may

---

48. *See Booker,* 543 U.S. at 237, 125 S.Ct. 738 ("As it thus became clear that sentencing was no longer taking place in the tradition that Justice Breyer invokes, the Court was faced with the issue of preserving the ancient guarantee under a new set of circumstances.... And it is the new circumstances, not a tradition or practice that the new circumstances have superceded, that have led us to the answer first considered in *Jones* and developed in *Apprendi* and subsequent cases[,] culminating with this one. It is an answer not motivated by Sixth Amendment formalism, but by the need to preserve Sixth Amendment substance.").

impose *without* any additional findings." *Blakely,* 542 U.S. at 303–04, 124 S.Ct. 2531 (first emphasis added). Thus, "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict*". *Id.* at 303, 124 S.Ct. 2531.

The lesson of the Supreme Court's most recent jurisprudence, therefore—Remedial *Booker* notwithstanding—is that every fact which the law identifies as relevant to guilt or punishment has heightened, constitutional significance. *Apprendi,* 530 U.S. at 494, 120 S.Ct. 2348 ("[T]he relevant inquiry is not one of form, but of effect—does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?"). These facts must be represented in the verdict. Call them what you want—elements, factors, *or reasonableness criteria;* if the existence of certain facts identified by the law is to affect the defendant's sentence, then the Constitution provides procedural protections to the defendant in the finding of those facts. These procedural protections consist of those additional aspects of the rule to which I now turn.

## B. Proved to a Jury

This Court has written on the virtues of the American jury in both civil and criminal contexts for nearly two decades.[49] I take the opportunity to do so again here because there is no other proceeding in which the jury's role is more fundamental than a criminal trial.

Blackstone wrote that "[s]ome authors have endeavoured to trace the origin[ ] of juries up as high as the Britons themselves, the first inhabitants of our island; but certain it is, that they were in use among the earliest Saxon colonies". 3 Blackstone, *supra,* at 349.[50] Blackstone considered trial by jury "the glory of the English law." *Id.* at 379. In 1215, trial by jury was significant enough to have been specifically protected in the Magna Carta—"more than once insisted on as the principal bulwark of our liberties". *Id.* at 350.[51]

**49.** *See, e.g., EIU Group, Inc. v. Citibank Del., Inc.,* 429 F.Supp.2d 367 (D.Mass.2006); *DeLaventura v. Columbia Acorn Trust,* 417 F.Supp.2d 147 (D.Mass.2006); *In re Relafen Antitrust Litig.,* 231 F.R.D. 52 (D.Mass.2005); *Enwonwu v. Chertoff,* 376 F.Supp.2d 42, 78–85 (D.Mass.2005); *Miara v. First Allmerica Fin. Life Ins. Co.,* 379 F.Supp.2d 20, 69 n. 57 (D.Mass.2005); *United States v. Green,* 346 F.Supp.2d 259 (D.Mass.2004); *Berthoff v. United States,* 140 F.Supp.2d 50, 61–95 (D.Mass.2001); *Ciulla v. Rigny,* 89 F.Supp.2d 97, 102 n. 7 (D.Mass.2000); *Lirette v. Shiva Corp.,* 27 F.Supp.2d 268, 271 n. 3 (D.Mass. 1998); *Andrews–Clarke v. Travelers Ins. Co.,* 984 F.Supp. 49, 63 n. 74 (D.Mass.1997); *In re Acushnet River & New Bedford Harbor,* 712 F.Supp. 994 (D.Mass.1989); *see also* William G. Young, *Vanishing Trials, Vanishing Juries, Vanishing Constitution,* Suffolk L.Rev. (forthcoming Fall 2006); William G. Young, *An Open Letter to U.S. District Judges,* Fed. Law., July 2003, at 30–35.

**50.** The *Apprendi* dissenters faulted the majority for citing the third volume of the *Commentaries,* which deals with private wrongs, as opposed to the fourth volume, which deals with public wrongs. *See* 530 U.S. at 525–26, 120 S.Ct. 2348 (O'Connor, J., dissenting). Ably parrying this petty thrust, the majority correctly pointed out that "Blackstone himself directs us to [the third volume] for these purposes." *Id.* at 479 n. 6, 120 S.Ct. 2348 (quoting 4 Blackstone, *supra,* at 343 ("The antiquity and excellence of this trial [by jury], for the settling of civil property, has before been explained at large. And it will hold much stronger in criminal cases . . . .")); *see also* 3 Blackstone, *supra,* at 379 ("And, if [trial by jury] has so great an advantage over others in regulating civil property, how much must that advantage be heightened, when it is applied to criminal cases!").

**51.** *See also* 3 Blackstone, *supra,* at 379 ("[Trial by jury] is the most transcendent privilege which any subject can enjoy[ ] or wish for, that he cannot be affected either in his property, his liberty, or his person, but by the unanimous consent of twelve of his neighb-

This significance was not lost on American colonists. As Professor Akhil Reed Amar explains,

[L]ate-eighteenth-century America placed great faith in her juries, civil and criminal, grand and petit. Before 1776, colonial jurors had stood shoulder to shoulder with colonial assemblymen to defend American self-governance against a formidable alliance of unrepresentative imperial officers and institutions. . . . In the 1760s and 1770s, Americans used [juries] to assail imperial policies and shield patriot practices. In response, British authorities tried to divert as much judicial business as possible away from American juries. . . . Revolted, Americans revolted.

Akhil Reed Amar, *America's Constitution: A Biography* 233 (2005) [hereinafter, Amar, *Constitution*].[52] Among the "causes which impel[led] them to the separation" listed in the Declaration of Independence was that King George had "depriv[ed] [Americans] in many cases[ ] of the benefit of Trial by Jury" and had "transport[ed] [them] beyond Seas to be tried for pretended offenses". *The Declaration of Independence* paras. 1, 20, 21 (U.S.1776).[53]

Respect for the jury continued thereafter, as evidenced by the fact that "the only right secured in all state constitutions penned between 1776 and 1787 was the right to trial by jury in criminal cases." Amar, *Bill of Rights, supra,* at 83. Likewise, when, in 1789, attention turned to the drafting and ratification of our present Constitution, juries were at the fore. The Philadelphia document did provide that "[t]he Trial of all Crimes . . . shall be by Jury . . .", *U.S. Const.* art. III, § 2, cl. 3, but much discussion was centered around the lack of provision for civil juries, *see generally EIU Group, Inc.,* 429 F.Supp.2d at 381–82. The debate confirms early-American veneration for the jury as an institution. Alexander Hamilton, writing as Publius, described this sentiment: "The friends and adversaries of the plan of the convention, if they agree in nothing else, concur at least in the value they set upon the trial by jury: Or if there is any difference between them, it consists in this; the former regard it as a valuable safeguard to liberty, the latter represent it as the very palladium of free government." *The Federalist* No. 83 (Alexander Hamilton). To allay Anti–Federalist concerns that the Constitution was not protective enough,

ours and equals. A constitution, that I may venture to affirm has, under providence, secured the just liberties of this nation for a long succession of ages. And therefore a celebrated French writer [Montesque], who concludes, that because Rome, Sparta, and Carthage have lost their liberties, therefore those of England in time must perish, should have recollected that Rome, Sparta, and Carthage, were strangers to the trial by jury.").

52. This recent book by Professor Amar has been called "the second best book ever written about the U.S. Constitution"—an "amazingly, almost disturbingly close second" only to *The Federalist.* Michael Stokes Paulsen, *How To Interpret the Constitution (and How Not To),* 115 Yale L.J.2037, 2038 (2006); *see also* Scott Turow, *Everything Is Illuminated,* Wash. Post, Sept. 25, 2005, at BW03 ("It is

. . . an uncommonly engaging work of scholarship and deserves to be valued as such."); Gordon S. Wood, *How Democratic Is the Constitution,* N.Y. Rev. Books, Feb. 23, 2006, at 25, 25–27 ("[A]s a reference book, it is superb. It is, so far as I know, the fullest and most reliable explanation of the written Constitution that we have.").

53. *See also* Akhil Reed Amar, *The Bill of Rights* 83 (1998) [hereinafter, Amar, *Bill of Rights*] (noting that "these words, in turn, built on the 1774 Declaration of Rights of the First Continental Congress—'the respective colonies are entitled to . . . the great and inestimable privilege of being tried by their peers of the vicinage'—and the 1775 Declaration of the Causes and Necessity of Taking Up Arms affirming the 'inestimable privilege of trial by jury.' ").

"[j]uries, guaranteed in no fewer than three amendments, were at the heart of the Bill of Rights." Amar, *Bill of Rights, supra,* at 83.

These concerns were born of an astute, practical understanding of government power and its exercise. The court system is where government policy is imposed on individual people, and juries historically are the last popular hurdle the government must clear before that imposition. In a very tangible sense, then, "[t]he great object of a trial by jury in criminal cases is[ ] to guard against a spirit of oppression and tyranny on the part of the rulers". Joseph Story, 3 *Commentaries on the Constitution* § 1774, at 653 (Rothman & Co. ed.1991); *see also* 3 Blackstone, *supra,* at 350. Colonial Americans were all-too-familiar with the necessity of this protection. Professor Rachel E. Barkow recounts one of the most notable episodes:

> In 1734, the royal governor in New York sought to punish [John Peter] Zenger for publishing criticism of the administration. After three grand juries refused to indict Zenger, the governor prosecuted him on the basis of an "information." At the trial, Zenger's lawyer argued that the petit jurors "ha[d] the right, beyond all dispute, to determine both the law and the fact" and .could conclude that the truth of Zenger's criticisms could be the basis of an acquittal, even though the law on the books stated that truth was not a defense to libel. The jurors used their power to return a general verdict to acquit. The case was highly publicized; an account of the trial was produced in pamphlet form and widely circulated throughout the colonies. It "impressed thousands of Americans with the importance of the right to jury as a bulwark against official oppression" and "revolutionized America." It was one of many cases in which a jury essentially nullified the law of seditious libel, and it demonstrated the jury's

power to decide cases based on its notions of fundamental law.

Rachel E. Barkow, *Recharging the Jury: The Criminal Jury's Constitutional Role in an Era of Mandatory Sentencing,* 152 U. Pa. L.Rev. 33, 52 (2003) (footnotes omitted, second alteration in original); *see also* Amar, *Bill of Rights, supra,* at 84–88.

It is clear beyond peradventure that what the Founders had in mind by protecting criminal juries was the protection of the people's ability to .continue so to rule. *See* Barkow, *supra* at 46–84. Taken in combination, the jury's widely accepted power to issue a general verdict, if an acquittal, together with the Fifth Amendment's Double Jeopardy Clause, creates the possibility of an absolute veto by the people before the government can succeed in attaching the label "criminal" to any defendant. *See id.* at 48–50; Amar, *Bill of Rights, supra,* at 96–98. One variation on this theme was known, at common law, as "pious perjury", in which the jury would convict on some lesser-included offense even though the evidence supported the more serious charge. *See* 4 Blackstone, *supra,* at 238–39, 354; *see also Apprendi,* 530 U.S. at 479 n. 5, 120 S.Ct. 2348 (citing Blackstone); *Jones,* 526 U.S. at 245, 119 S.Ct. 1215 (same). The primary function of this practice related to sentencing. Because, "[a]t common law, the substantive criminal law tended to be sanction-specific", jurors possessed a "de facto sentencing function". Barkow, *supra,* at 70–71 (internal quotation marks omitted). As Professor Barkow reports,

> In his study of juries in England from 1200 to 1800, Thomas Green found that jurors consistently acquitted defendants of capital charges and convicted on lesser charges because they believed the laws to be too harsh as applied to the defendant. In another example, John Langbein reports that, in eighteenth-

century England, the jury not only decided guilt, but it chose the sanction through its manipulation of the partial verdict. Thus, jurors would downgrade from grand to petty larceny if the goods were of relatively small value or if the jury sympathized with the defendant. *Id.* at 79 (internal quotation marks, alteration, and footnotes omitted) (citing Thomas Andrew Green, *Verdict According to Conscience: Perspectives on the English Criminal Trial Jury 1200–1800* 28–64, 261, 269, 360 (1985); John H. Langbein, *Shaping the Eighteenth–Century Criminal Trial,* 50 U. Chi. L.Rev. 1, 55 (1983)). The Supreme Court has endorsed this view of the criminal jury. *See Blakely,* 542 U.S. at 306, 124 S.Ct. 2531 (referring to the jury's role "as circuit breaker in the State's machinery of justice").

Historical reasons to one side (though those would be sufficient), this Court does not rest its affirmative case for American criminal juries on their nullification power. Indeed, this Court—as do most—emphatically instructs jurors that, on their oaths as jurors, they must follow the law as the Court teaches it to them. Although juries, through their general verdict, have the raw power not to follow the law in its application to the facts, this usually is not something to be exalted. The power to act lawlessly to a defendant's benefit is also the power to act lawlessly to his detriment. Granted, in colonial America, jury nullification was a vaunted tool of patriots and, as such, effectively was protected in the Constitution. "[T]o some extent," however, "the centrality of the jury as late as 1789

may have reflected lessons from the past". Amar, *Bill of Rights, supra,* at 109. "Once American legislatures had wrested control from Parliament and federal judges had won life tenure and other attributes of independence, perhaps juries would not need to carry all the load they had borne before. . . ." *Id.* at 110.[54]

Perhaps not all the load, but still an important share. The theory behind the central role of the American jury in the exercise of judicial power still has extraordinary relevance today. *Enwonwu,* 376 F.Supp.2d at 80–81. Before the jury's continuing importance adequately can be explained, however, one must understand the jury's structural role in the Constitution.

Historian Herbert J. Storing writes, "The question was not fundamentally whether the lack of adequate provision for jury trial would weaken a traditional bulwark of individual rights (although that was also involved) but whether it would fatally weaken the role of the people in the *administration* of government." Amar, *Bill of Rights, supra,* at 94 (internal quotation marks omitted) (quoting Herbert J. Storing, *What the Anti–Federalists Were For* 19 (1981)); *see also id.* at 94 n. 43 (citing and quoting other sources, including Blackstone and John Hancock). As Professor Amar has argued, the jury's structural role, therefore, is significant: It is the people's voice in the judiciary. Amar, *Bill of Rights, supra,* at 94–96; Amar, *Constitution, supra,* at 236–37.

---

54. Explaining this belt-and-suspenders approach, Professor Amar continues, "But could Americans in 1789 be sure that a small and newfangled Congress would never become as aloof and distant as Parliament had been, or that federal judges seeking power and promotions would never abet a grasping executive? Abiding ideologies of liberty and ingrained patterns of thought and action do not

die overnight. Thus when Federalists proposed to summon up a new and awesome imperial government to stand in the shoes of the ousted British king, many suspicious Americans instinctively reached for their trusty ideological weapons, without asking whether those weapons had been crafted to win the last war, rather than the next one." Amar, *Bill of Rights, supra,* at 110.

In effect, each of the three branches of the federal government featured bicameral balance. In the legislature, members of Congress's lower house—more numerous than senators, more localist, with shorter terms of office and more direct links to the electorate—would counterbalance the members of the upper house. In the executive branch, local citizen militias would counterbalance the central government's professional soldiers, and local citizen grand jurors would counterbalance the central government's professional prosecutors. So, too, within the judiciary, trial jurors would counterbalance trial judges.

Amar, *Constitution, supra,* at 237. Unorthodox as this conception may seem to modern Americans, who feel that branches of their government becoming ever more distant, Professor Amar has it right.

The Federal Farmer put it well:

It is essential in every free country, that common people should have a part and a share of influence[ ] in the judicial as well as in the legislative department. ... The trial by jury in the judicial department[ ] and the collection of the people by their representatives in the legislature ... have procured for them, in this country, their true proportion of influence, and the wisest and most fit means of protecting themselves in the community. Their situation, as jurors and representatives, enables them to acquire information and knowledge in the affairs and government of the society; and to come forward, in turn, as the [s]entinels and guardians of each other.

Amar, *Bill of Rights, supra,* at 94–95 (first and second alteration in original) (quoting *Letters from the Federal Farmer* (IV), *reprinted in* 2 *The Complete Anti–Federalist* 249–50 (Herbert J. Sorting ed.1981)). Contemporary references of this sort abound. *See id.* at 95 ("[T]he Maryland Farmer defined the jury as 'the democrat-ic branch of the judiciary power*—more necessary than representatives in the legislature.' So too, the Anti–Federalist Hamden described 'trial by jury' as 'the democratical balance in the Judiciary power'....").* Thomas Jefferson remarked that "it is necessary to introduce people into every department of government.... Were I called upon to decide whether the people had best be omitted in the Legislative or Judicial department, I would say it is better to leave them out of the Legislative." *Id.* (alteration in original, internal quotation marks omitted) (quoting Letter from Thomas Jefferson to L'Abbé Arnoux (July 19, 1789), *in The Papers of Thomas Jefferson* 282, 283 (Julian P. Boyd ed.1958)). Writing some years later, the famous anthologist of all things American, Alexis de Tocqueville, summed it up: "The jury is, above all, a political institution [not merely judicial], and it must be regarded in this light in order to be duly appreciated." 1 Alexis de Tocqueville, *Democracy in America* 282 (Vintage Books ed.1990).

The Supreme Court in *Blakely* unmistakably adopted this conception of the jury's role in the constitutional structure. It wrote, "Our commitment to *Apprendi* in this [guidelines] context reflects ... the need to give intelligible content to the right of jury trial. That right is no mere procedural formality, but a fundamental reservation of power in the constitutional structure. *Just as suffrage ensures people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary."* *Blakely,* 542 U.S. at 305–06, 124 S.Ct. 2531 (emphasis added); *see also Powers v. Ohio,* 499 U.S. 400, 406, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) ("The opportunity for ordinary citizens to participate in the administration of justice has long been recognized as one of the principle justifications for retaining the jury system."). That the jury be allowed to serve in its sentencing role is no less a part of

Article III than it is of the Sixth Amendment. *See* Jackie Gardina, *Compromising Liberty: A Structural Critique of the Sentencing Guidelines*, 30 U. Mich. J.L. Reform 345, 374–88 (2005).

Far from mere theoretical aspirations, this "popular" conception of the judiciary yields practical benefits. As this Court has written in the context of civil juries, "All of our rules of law purport to be based on the collective values of the community." *Acushnet River*, 712 F.Supp. at 1005. "[T]he jury achieves symbolically what cannot be achieved practically—the presence of the entire populace at every trial." P. DiPerna, *Juries on Trial* 21 (1984). "Like all government institutions, our courts draw their authority from the will of the people to be governed. The law that emerges from these courts provides the threads from which all our freedoms are woven. It is through the rule of law that liberty flourishes. Yet, there can be no universal respect for the law unless all Americans feel that it is *their* law. Through the jury, the citizenry takes part in the execution of the nation's laws, and in that way each can rightly claim that the law partly belongs to her." *Acushnet River*, 712 F.Supp. at 1005 (internal quotation marks and citation omitted).

This applies all the more to criminal conviction and incarceration—the most grave action a government can take against an individual. "The jury adds a unique perspective to the criminal justice system: the views of the community." Barkow, *supra*, at 77. "In a very real sense . . . a jury verdict actually embodies our concept of 'justice.'" *Acushnet River*, 712 F.Supp. at 1005. More than that, under the theory articulated by Professor Amar and endorsed by the Supreme Court, the criminal jury is a constitutional necessity. The criminal jury is not simply a machine into which we insert data and out of which come "facts" for judges' use in legal rulings. It is also—and more importantly—an independent source of power in our constitutional system. Excluding juries from determinations affecting a defendant's liberty is no less offensive to the Constitution than enacting a revenue bill without approval of the House of Representatives, ratifying a treaty without a vote of the Senate, or seating a judge without the President's nomination.

Realizing the significant structural role of the jury, we can return to the question of its continued functional significance. The mere fact that a *jury* reached a particular decision lends moral force to that decision—much more than if it were reached solely by a judge. As Professor Amar writes of the Boston Massacre trials, in which the British soldiers (represented by John Adams) were acquitted on most charges, "the[ ] [jury] verdicts carried special legitimacy precisely because local juries had made the decisions, after open trials that could be easily monitored by the victims' friends and families and Bostonians more generally." Amar, *Constitution, supra*, at 237. Judicial actions, therefore, acquire their legitimacy under our Constitution by having been vetted and approved by an American jury.[55]

---

55. The jury decision's moral force, derived from the popular constitution of that body, is not the only advantage of such a system. The fact is that juries are more likely to reach the correct decision. Just as nine judges are better than three when expounding the law, twelve heads are better than one when it comes to the review and weighing of often-murky evidence resulting in an ultimate finding of fact. James Wilson, a Pennsylvania delegate to the constitutional convention put it well:

> [Trial by jury] has excellencies that entitle it to a superiority over any other mode. . . . Where jurors can be acquainted with the characters of the parties[ ] and the witnesses, where the whole cause can be brought within their knowledge and their view, I know no mode of investigation

Quite apart from nullification, juries serve an important structural function by bolstering the credibility and popular appeal of the judiciary. Though creating an independent judiciary may have assuaged the need for jury nullification of executive power run amok, only the most closed-minded imperialists of executive and congressional power would denigrate the necessity of the judiciary to check those branches in appropriate cases. Today's juries serve to sustain judicial independence and legitimize the power exercised by the third branch when it is necessary to do so. As I have written previously, "[o]nly because juries may decide most cases is it tolerable that judges decide some." William G. Young, "An Open Letter to Federal Judges", Fed. Law., July 2003, at 30.

In the modern political climate, the judiciary is under mounting criticism and the Congress increasingly uses tactics that re-strict the judiciary's proper function.[56] Justices O'Connor and Breyer valiantly and regularly have come to the defense of judicial independence[57]; but their views, as expressed in *Apprendi* and *Blakely* and which were triumphant in Remedial *Booker*, play directly into the hands of those who conspire against "unelected judges". As the people's representatives in the judicial branch, juries bring a popular legitimacy to judicial acts. Minimizing their role, as did Remedial *Booker*, only serves to weaken the judiciary further against these attacks. There is no better way to protect the power of the judiciary than to give it away to the people—to our juries.

These sentiments apply with especial force in the area of criminal sentencing. The aggrandizement of executive power which the Guidelines enabled is now generally recognized by all thoughtful observers. *See Green*, 346 F.Supp.2d at 263–89 (citing many sources); Gardina, *supra*, at

---

equal to that by a jury; they hear everything that is alleged; they not only hear the words, but they see and mark the features of the countenance; they can judge of the weight due to such testimony.... James Wilson's Summation and Final Rebuttal at the Pennsylvania Ratifying Convention (Dec. 11, 1787), *in* 1 *Debate on the Constitution* 832, 854–55 (Bernard Bailyn ed., 1993). Blackstone likewise praised the jury's truth-seeking abilities. *See* 3 Blackstone, *supra*, at 355 ("[O]bserve ... how admirably [trial by jury] is adapted and framed for the investigation of truth, beyond any other method of trial in the world."). Trial by jury "is, quite simply, the best we have." *In re Acushnet River*, 712 F.Supp. at 1005.

**56.** Various members of Congress have called for the impeachment of judges for rulings with which they disagree, have proposed to strip courts of jurisdiction over certain issues, to cut court budgets in retaliation, to call judges before congressional committees to explain their rulings, and to prohibit the executive from enforcing judicial decisions. *See Judiciary Under Fire*, The Fresno Bee, Apr. 16, 2005, at B8. Most recently, on July 19, the House of Representatives approved a bill re-moving jurisdiction from federal courts in cases involving the Pledge of Allegiance. *See* Pledge Protection Act of 2005, H.R. 2389, 109th Cong. (2006).

**57.** Justice O'Connor gave a notable speech on the topic on March 6, 2006, at Georgetown University, reported by National Public Radio's Nina Totenberg. *At* http://www.npr.org/templates/story/story.php?storyId=5255712. Justice O'Connor gave a similarly themed speech in November 2005 at the American Academy of Appellate Lawyers, the text of which is available at http://www.appellateacademy.org/events/oconnor_remarks_110705.pdf.

The late Chief Justice Rehnquist also devoted an entire section of his last *Year–End Report* to the problem of political attacks on judges. *See* Chief Justice William H. Rehnquist, *2004 Year–End Report on the Federal Judiciary* 4–8 (Jan. 1, 2005) ("Although arguments over the federal Judiciary have always been with us, criticism of judges, including charges of activism have in the eyes of some taken a new turn in recent years."), *available at* http://www.supremecourtus.gov/publicinfo/year-end/ 2004year-endreport.pdf.

358–69. Post-*Booker* circuit court decisions, overwhelmingly favorable to government appeals, *see supra* note 36, have shown that not much has changed. The executive is still in the pilot seat with regard to the determination of criminal sentences. Even with "advisory" Guidelines, judges are "limited by appellate review. . . . The jury, in contrast, . . . faces no review by a court or legislature. It therefore has greater opportunity than a judge to check the state. . . ." Barkow, *supra*, at 60–61 (internal quotation marks and footnotes omitted). A return to "[t]he historic link between verdict and judgment" as commanded by *Apprendi*, 530 U.S. at 482, 120 S.Ct. 2348, would do much to restore the proper balance among the branches in criminal sentencing and would, as well, enhance the general legitimacy of judicial acts.

## C. Beyond a Reasonable Doubt

A summary of this aspect of the rule starts where all criminal courts start: the presumption of innocence. In *Coffin v. United States*, the Supreme Court cited sources speculating that the presumption of innocence dates from the time of Moses, as recorded in the Book of Deuteronomy, and "was substantially embodied in the laws of Sparta and Athens." 156 U.S. 432, 454, 15 S.Ct. 394, 39 L.Ed. 481 (1895). Expressing no view on this ancient pedigree, the Court wrote, however, that "there can be no question that the Roman law was pervaded with the results of this maxim of criminal administration". *Id.* "The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." *Id.* at 453, 15 S.Ct. 394.

To begin by recognizing the presumption of innocence is essential when discussing the standard of proof, lest the discussion become unmoored from its purpose. For, the presumption of innocence is guarded in large measure by the standard of proof necessary to overcome it. *See* Anthony A. Morano, *A Reexamination of the Development of the Reasonable Doubt Rule*, 55 B.U. L.Rev. 507, 509 (1975).[58]

The standard, like the presumption, also is said to have biblical roots. Blackstone repeated the familiar phrase that "the law holds[ ] that it is better that ten guilty persons escape, than that one innocent suffer." 4 Blackstone, *supra*, at 352.[59]

**58.** *See also Coffin*, 156 U.S. at 456, 15 S.Ct. 394 (quoting *McKinley's Case*, 33 State Tr. 275, 306 (1817) ("[T]he presumption in favor of innocen[s]e is not to be redargued by mere suspicion. I am sorry to see, in this information, that the public prosecutor treats this too lightly; he seems to think that the law entertains no such presumption of innocen[s]e. I cannot listen to this. I conceive that this presumption is to be found in every code of law which has reason and religion and humanity, for a foundation. It is a maxim which ought to be inscribed in indelible characters in the heart of every judge and juryman. . . . To overturn this, there must be legal evidence of guilt, carrying home a decree of conviction short only of absolute certainty.")).

**59.** The exact number of guilty persons society will tolerate at liberty so as to protect the innocent is a matter of some debate. *See Coffin*, 156 U.S. at 455–56, 15 S.Ct. 394 (quoting Fortesque, saying that "one would much rather that twenty guilty persons should escape punishment of death than that one innocent person should be condemned and suffer capitally", as well as Lord Hale, saying that "it is better five guilty persons should escape unpunished than one innocent person should die"). The issue also has received the attention of more omnipotent parties than the Supreme Court. *See Genesis* 18:22–32 (relating the discussion between God and Abraham over the destruction of Sodom, in which Abraham extracts concessions from God that He will not destroy the city if 50, then 45, 40, 30, 20, and finally only 10 righteous people are found therein). Though the question will not today be answered with any more exactitude, the principle sought is clear enough.

The earliest authorities indicate that the original standard "closely approximated absolute certainty". Morano, *supra*, at 511. With "[t]he [i]nfusion of [r]eason into the [l]aw" in the late seventeenth century, however, only the absence of "reasonable" doubt as to a defendant's guilt was necessary to support a conviction. *Id.* at 513–15. Though this development "had the effect of reducing the prosecutor's burden of proof in criminal trials", new rules of evidence had also "limited the prosecutor's ability to present information to the jury and thereby made it more difficult to prove the defendant's guilt beyond any doubt." *Id.* at 514. The reasonable doubt standard, then, "restore[d] the balance between the defendant and the prosecutor." *Id.* at 515. In any event, reason is now such an integral and accepted part of the law that it is hardly necessary to justify the marginally lesser prosecutorial burden.

The Supreme Court in *Apodaca v. Oregon* retailed the common belief that the first use of the reasonable doubt standard was in Dublin, Ireland, in 1798. 406 U.S. 404, 412 n. 6, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972).[60] Professor Morano's own analysis, however, concludes that the first recorded use of the reasonable doubt standard was here in Boston during the second of the Boston Massacre Trials in 1770, *Rex v. Wemms*. Morano, *supra*, at 516–19. Countering John Adams's argument that the jury should acquit the British soldiers "if you doubt of the prisoner's guilt", Robert Treat Paine argued instead that "if the Evidence be sufficient to convince you of their Guilt beyond a *reasonable* Doubt[,] the Justice of the Law will require you to declare them Guilty." *Id.* at 517 (emphasis added) (quoting the account relayed in 3 L. Wroth & H. Zobel, *Legal Papers of*

*John Adams* (1965)). Despite scattered pre-revolutionary application of the standard, judicial acceptance was not solidified until the late nineteenth century. Widespread use of it by courts likely existed decades earlier, though. Morano, *supra*, at 519–24.

The standard became relevant to the present discussion with the Supreme Court's holding in *In re Winship*, which made the use of the reasonable doubt standard integral to Due Process. 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Though it had never explicitly so ruled prior to that case, the Court did note that the necessity for such a standard had "long been assumed". *Id.* at 362, 90 S.Ct. 1068 (citing cases as far back as 1895). In adopting it, the Court noted that the reasonable doubt standard "plays a vital role in the American scheme of criminal procedure" and that "[i]t is a prime instrument for reducing the risk of convictions resting on factual error." *Id.* at 363, 90 S.Ct. 1068.

A high standard addresses the significant concerns of the two beneficiaries of justice: the defendant and society. First, the Supreme Court agreed with the dissenters in the court below that "a person accused of a crime ... would be at a severe disadvantage, a disadvantage amounting to a lack of fundamental fairness, if he could be adjudged guilty and imprisoned for years on the strength of the same evidence as would suffice in a civil case." *Id.* (alteration in original, internal quotation marks omitted). "[T]he reasonable-doubt standard is indispensable" because it reduces the margin of error of wrongly depriving a defendant of his liberty—"an interest of transcending

---

**60.** Professor Morano attributes this theory to an article written by Judge John Wilder May in 1876. Morano, *supra*, at 515 (citing May, *Some Rules of Evidence: Reasonable Doubt in* *Civil and Criminal Cases,* 10 Am. L.Rev. 642 (1876)). Both Wigmore and McCormick accepted this account. *Id.*

value". *Id.* at 364, 90 S.Ct. 1068 (internal quotation marks omitted). Second, the reasonable doubt standard is "indispensable to command the respect and confidence of the community in applications of the criminal law. It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned. It is also important in our free society that every individual going about his ordinary affairs have confidence that his government cannot adjudge him guilty of a criminal offense without convincing a proper factfinder of his guilt with utmost certainty." *Id.* at 364, 90 S.Ct. 1068.

These interests are no less relevant or important today than they were in 1970. Nor is the protection afforded by the reasonable doubt standard less applicable to the determination of Guidelines enhancement facts than to factual determinations of guilt. The revival of *Mullaney's* functional framework, *see supra* Part III.A, supports this conclusion. *See infra* Part IV.B.3; *cf. Winship*, 397 U.S. at 365–68, 90 S.Ct. 1068 (applying reasonable doubt standard to factual determinations in a juvenile delinquency proceeding).

## IV. The Court Prepares for Trial

Traversing the legal landscape limned above is difficult—particularly since the transitory heat haze so frequently obscures the constitutional bedrock. Of course, as a trial judge, I must obey the commands of both the Supreme Court and the First Circuit. I do—but it isn't easy.

By Spring of 2004, having read William J. Trach's note in the *Harvard Law Re-*

*view*[61], I became convinced that the federal mandatory Guidelines were unconstitutional. I began to work up my analysis, which was eventually released in an opinion on June 18, 2004, styled *United States v. Green*, 346 F.Supp.2d 259 (D.Mass.2004); six days later, I naturally was pleased when *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), confirmed this analysis. A trial judge cannot afford the luxury of waiting for an appellate decision on every issue of constitutional moment, however, and it is the responsibility of every judicial officer to correct an unconstitutional procedure just as soon as he becomes convinced of its unconstitutionality. Therefore, that spring, the Court already had altered its standing procedures for handling trials and taking pleas.[62]

### A. The Court's Initial Standing Procedure: "*Blakely*-izing" the Guidelines

At the initial criminal case management scheduling conference, the Court inquires of the government what, if any, enhancements it will seek should the defendant be convicted. The Court then informs all parties that the government must prove such enhancements to the jury at the trial beyond a reasonable doubt pursuant to the Federal Rules of Evidence. *But see infra* Parts IV.B.1 & IV.B.3. If, after deliberation, the jury finds the defendant guilty of the charged crime, it is also (on the same verdict form) asked whether the government has proven the Guidelines enhancement facts. The jury is instructed to use the same reasonable doubt standard as to

---

61. Note, *The Unconstitutionality of Determinate Sentencing in Light of the Supreme Court's "Elements" Jurisprudence*, 117 Harv. L.Rev. 1236 (2004).

62. As this session of the Court had these procedures in place even before the *Blakely* deci-

sion was announced, the bar called this "*Apprendi*-izing" the Guidelines. *See* Gregory I. Messing, *United States v. Booker and a Meaningful Role for the Jury*, 90 Mass. L.Rev. 10, 18 n. 107 (2006).

these facts. As a corollary, when taking a plea, the Court carefully reminds the defendant that he has a right to a jury trial on any disputed enhancement and that it is the policy of the Court still to confer the Guidelines' discount for a plea should the government fail to meet its burden of proof as to that enhancement. In either event, the Court initially considered itself bound by the jury's findings. *But see infra* Parts IV.B.1 & IV.B.2. The defendant may, of course, waive the proffered jury trial as to any enhancement, in which case a jury-waived trial as to the enhancement will follow the main jury trial or the plea. The burden of proof at such trial similarly was beyond a reasonable doubt upon a record of evidence admissible under the Federal Rules of Evidence.

There's nothing original about any of this. It was (and remains) the logical response to *Blakely.* Immediately after that decision, the Office of the United States Attorney for the District of Massachusetts commenced detailing enhancements in its indictments. Also, having not followed such a procedure in *United States v. Fanfan* (and understandably so, pre-*Blakely),* Judge D. Brock Hornby of the District of Maine concluded in the eventual companion case to *Booker* that he could not use non-jury findings when imposing the sentence. No. 03–47, 2004 WL 1723114, at *5 (D.Me. June 28, 2004), *rev'd* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). Moreover, in the wake of *Blakely,* a number of states have adopted this same procedure or some variant thereof, *See* Jon Wool, *Beyond Blakely: Implications of the* Booker *Decision for State Sentencing Systems,* 17 Fed. Sentencing Rep. 285, 285 (2005), and the Commission itself reported *"Blakely-*izing" the Guidelines as a possible—and practiced—trial court response, U.S. Sentencing Commission, Preliminary Findings: *Federal Sentencing Practices Subsequent to the Supreme Court's Decision in Blakely v. Washington,* Nov. 2004, at 4, 10, at http://www.ussc.gov/Blakely/blakelyoutreachpreliminaryfindings.pdf.

Then came Remedial *Booker.*

## B. The Court's Present Standing Procedure (Revised to Accommodate Remedial *Booker* )

I well remember the advent of *Booker.* We were trying a jury case. The law clerks, recognizing my continuing interest in these matters, e-mailed the decision to my courtroom deputy clerk, Elizabeth Smith, in the courtroom. She began printing out the decision. The courtroom printer is notoriously slow. As the first page came out of the printer, she slapped on a "Post–It" note and, grinning, passed it up to me. On the note was a little smiley face and the words "You'll love this!" Page by page, Justice Stevens's majority opinion was passed up to me until it was fully assembled.

The printer kept on humming.

Ms. Smith stopped passing the pages in order to scan for herself what turned out to be Remedial *Booker.* After three or four pages had printed out, she applied another "Post–It" and, crestfallen, passed them up. The second note read, "How can there be two different majority opinions in the same case?"

How indeed?

As described above, even before *Blakely,* this Court's practices had reflected the preferred remedy of the dissenting Justices in Remedial *Booker. See Green,* 346 F.Supp.2d at 259 (D.Mass.2004). Remedial *Booker,* however, required this Court to revise its standard procedures for criminal trials and sentencings. I did so at once. The Court's modified practice, while still giving effect to *Apprendi, Blakely,* and Constitutional *Booker,* is also faithful to Remedial *Booker* and to subsequent First Circuit precedent.

### 1. Today's Law

At present, this Court understands the applicable law to be as follows:

- It is unconstitutional for a sentencing court to think itself bound by the Guidelines or for an appellate court categorically to mandate a sentence within the Guidelines range. *Booker*, 543 U.S. at 233–35, 259, 125 S.Ct. 738.

- A sentencing court must, however, calculate and consider the Guidelines before imposing a sentence on any given defendant. *Booker*, 543 U.S. at 264, 125 S.Ct. 738.

- It is *not* unconstitutional for a sentencing judge—rather than a jury—to find the facts necessary to arrive at the appropriate Guidelines range. *Booker*, 543 U.S. at 249–58, 125 S.Ct. 738; *Antonakopoulos*, 399 F.3d at 75; *Yeje-Cabrera*, 430 F.3d at 23.

- The *judge must* so find those facts if supported by a preponderance of the evidence. *Yeje-Cabrera*, 430 F.3d at 23; *see infra* Parts IV.B.2 & IV.B.3.

- Though a sentencing court must consider all factors listed in Title 18, Section 3553(a) of the U.S.Code, the suggested Guidelines range is to be given "substantial weight". *Jimenez-Beltre*, 440 F.3d at 517, 518.

- Deviation from the Guidelines range must be for individualized, case-specific reasons—not in disregard of the policy decisions by Congress or the Commission as expressed in the Guidelines. *Pho*, 433 F.3d at 62. The court, however, is not prohibited from considering factors specifically prohibited or discouraged by the Guidelines. *Smith*, 445 F.3d at 5.

- The further a sentence departs from the Guidelines range, the more compelling the findings and explanation by the sentencing court must be. *Smith*, 445 F.3d at 4.

In light of these controlling decisions, this Court revised its standard procedure in one critical respect: It is presently the responsibility of the *judge* to find the facts upon which any Guidelines enhancement rests. I do so. All other aspects of the Court's procedure, however, have remained the same. *See supra* Part IV.A. The jury is now relegated to an advisory capacity. Its presence and involvement, of course, still focuses the evidentiary presentation and secures the fair, impartial, and fresh opinion of twelve ordinary Americans. Its advice is of inestimable—but presently not controlling—value. The Court, though, still wrestles with the appropriate standard of proof; but when Kandirakis came to be sentenced, I concluded that controlling precedent required me to apply a preponderance standard to Guidelines enhancement facts.

Both of these issues require some explanation.

### 2. Judicial Fact–Finding: The Role of an Advisory Jury

Many courts had anticipated *Blakely's* application to the Guidelines and began to require jury fact-finding of enhancements. In the wake of Remedial *Booker*, however, circuit courts quickly stamped out such movements. Most, in discussing the post-*Booker* role of the Guidelines, have ruled implicitly that the pre-*Booker*, judge-based procedure for finding enhancement facts has not changed. Some have done so explicitly. *See, e.g., United States v. Mares*, 402 F.3d 511, 519 (5th Cir.2005); *United States v. Crosby*, 397 F.3d 103, 114–15 (2d Cir.2005). Even this Court must concede that if Remedial *Booker* stands for nothing else, it is that judicial fact-finding was of paramount concern (indeed, preoccupation) to that five-Justice majority of the Supreme Court. *See supra* Parts II.C & II.D. That majority's remand of *Booker's* companion case, *United States v. Fanfan*, in which Judge Hornby refused to base a

defendant's sentence on facts not found by a jury, belies any contention that conclusive jury fact-finding is proper in light of Remedial *Booker.* *See Booker,* 543 U.S. at 267–68, 125 S.Ct. 738.

In *United States v. Yeje–Cabrera,* 430 F.3d 1 (1st Cir.2005), the First Circuit concluded likewise and reversed this Court, emphatically declaring business-as-usual with regard to finding Guidelines enhancements. "The district court was not 'constrained' by the jury's verdict, as it thought it was, to finding less than 500 grams of cocaine. Instead, it could (and should) have found [the defendant] responsible for the amount of cocaine established by a preponderance of the evidence against him.... That alone is reason to vacate the sentence and to remand."[63] *Id.* at 23. Calling this Court's decision "simply a wrong guess as to the direction the law

would take", *id.,* the First Circuit ruled that it was "well settled that ... the remedy was to make the Guidelines non-mandatory", not "require[ ] ... that certain issues ... be decided by a jury, not a judge", *id.* at 17.

Given that two members of the slim Remedial *Booker* majority no longer serve, this Court doubts how "well settled" its remedy is. *Accord Jimenez–Beltre,* 440 F.3d at 528 n. 11 (Lipez, J., dissenting); *see also infra* note 68 and accompanying text. Nevertheless, of course, I have and will scrupulously continue to obey the First Circuit's commands in this regard until my "guess" proves to be correct. In the meantime, conclusive jury fact-finding is not permitted.[64]

Nothing in Remedial *Booker* or subsequent First Circuit precedent, though, pre-

**63.** The First Circuit deemed this Court's *Green* opinion "advisory", even though "styled as a sentencing memorandum". *Yeje–Cabrera,* 430 F.3d at 22. Ironically, the First Circuit continued its discussion of this Court's reasoning for sixteen more pages after declaring its first reason "enough" for reversal.

The larger point is this: Federal judges are given lifetime tenure for a reason. Protected from the hurly-burly of the political world, we are the only constitutional officers who can feel safe from reprisal for speaking candidly on an issue. Though we must usually be diffident in what we *do,* it would be a dereliction of duty to fail to defend the truth with what we *say. See* Sarah M.R. Cravens, *Judges as Trustees: A Duty to Account and an Opportunity for Virtue,* 62 Wash. & Lee L.Rev. 1637, 1649 (2005) ("In the case of judgment orders or memorandum dispositions (in which no reasoning, but only outcomes, are provided), the avoidance of any explanation is, in my view, an outright abdication of the judicial role."). "[A] body of law is more rational and more civilized when every rule it contains is referred articulately and definitely to an end which it subserves and when the grounds for desiring that end are stated ... in words." Oliver Wendell Holmes, *The Path of the Law,* 10 Harv. L.Rev. 457, 469 (1897). As Cardozo remarked, "I sometimes think that we worry ourselves overmuch about the enduring consequences of our errors. They may work a

little confusion for a time. In the end, they will be modified or corrected or their teachings ignored. The future takes care of such things.... There is no assurance that the rules of the majority will be the expression of perfect reason when embodied in constitution or in statute. We ought not to expect more of it when embodied in the judgments of the courts. The tide rises and falls, but the sands of error crumble." Benjamin N. Cardozo, *The Nature of the Judicial Process* 177, 179 (1921).

This Court stands by its so-called advisory opinion with the hope that it might have influence in quarters beyond the First Circuit and in eras beyond this one.

**64.** To say, however, that Remedial *Booker* "alleviate[d] some of the concerns which motivate the district court", *Yeje–Cabrera,* 430 F.3d at 23, completely misapprehends the nature of the Court's concerns. Whatever this Court's view of the length of criminal sentences, it has no quarrel with its limited institutional role in carrying out the policy decisions of the Congress in this regard. The Court neither applauds nor laments its newfound discretion in sentencing. I, unlike many commentators, have never advocated for increased judicial discretion in sentencing. Rather, my primary concern always has been with the *process* by which the congressional

vents this Court from seeking the advice of an advisory jury on these most crucial matters. Thus, the Court—similar to its practice immediately following *Blakely*—has the government prove to the jury each Guidelines enhancement the government will seek to apply in calculating the Guidelines range if the defendant is convicted. At the trial or sentencing hearing, such proof still must consist of testimony and items placed in evidence pursuant to the Federal Rules of Evidence. Since Remedial *Booker*, however, when finding facts relevant to Guidelines enhancements, the Court (as before *Blakely*) considers the pre-sentence report filed by the Probation Office, as well as any other data placed before it by the government or the defendant. Based on all of this information, including the results of the jury's deliberation, the Court makes its own, *independent* finding on the presence or absence of such enhancements. The Court then imposes an appropriate sentence, giving substantial (but not controlling) weight to the advisory Guidelines range.

This procedure gives as much respect to the timeless principles articulated in *Apprendi*, *Blakely*, and Constitutional *Booker* as is currently allowed by Remedial *Booker* and First Circuit precedent. As required by *Yeje–Cabrera*, the Court makes its own, *independent* finding [65] regarding the necessary enhancements.[66]

---

policy is implemented and the fundamental necessity of the jury's involvement therein. Remedial *Booker* and the First Circuit's subsequent decisions do little to alleviate this concern.

**65.** The government has not yet grasped this fundamental aspect of the Court's procedure, as it repeatedly proselytizes this Court on the necessity for the Court to make its own factual determinations. *See United States v. Mittel–Carey*, No. 05–10335 (D.Mass. filed Dec. 7, 2005), Gov't's Notice [Doc. No. 30] at 5–12; *United States v. Ruiz–Morales*, No. 05–10109 (D.Mass. filed Apr. 20, 2005), Gov't's Mot. to Recons. [Doc. No. 11] at 4–8. To state it again: Pursuant to First Circuit law, the Court makes its own, independent finding on the relevant Guidelines enhancement facts; the Court does not adopt the jury's findings wholesale. This very case provides an excellent example of the Court's procedure in this regard. *See infra* Parts V & VI.

**66.** Counsel for Kandirakis argued that *United States v. Spock*, 416 F.2d 165 (1st Cir.1969), instructs that there can be no such "advisory" use of a jury verdict in a criminal case. See Sentencing Hr'g, Feb. 24, 2006 [Doc. No. 69], Tr. at 25–27. *Spock*, however, is inapposite. The judge in that case, in addition to the general question of guilt, asked the jury to find each element of the crime. *Spock*, 416 F.2d at 180. The *Spock* Court held this practice to be tantamount to "judicial pressure" to return a guilty verdict. *Id.* at 181. "There is

no easier way to reach, and perhaps force, a verdict of guilty than to approach it step by step." *Id.* at 182. The general verdict, therefore, is constitutionally protected.

In this case, however—as in all cases in which the Court employs these procedures—the special findings put to the jury are not the essential elements of the crime charged, but are simply the facts undergirding an enhancement. The *Spock* Court specifically recognized this exception to the normal rule prohibiting special verdicts. *Id.* at 183 n. 41. There is no reason to believe that juries are improperly led to a guilty verdict merely by the presence of issues to be resolved only upon such a finding. This Court instructs juries that they are to resolve questions about enhancement facts only if they first find guilt beyond a reasonable doubt. *See Francis v. Franklin*, 471 U.S. 307, 324 n. 9, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985) ("The Court presumes that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them.").

The closest common analogy is the jurisprudence of lesser included offenses in the Commonwealth of Massachusetts. There, for example, the jury must first determine whether the defendant has committed criminal homicide and then, with the addition of other elements proved beyond a reasonable doubt,

Further, as required by Remedial *Booker* and *Jimenez–Beltre*, the Court calculates and considers the Guidelines to the mandated degree, deviating only for case-specific reasons as required by *Pho*. It is true, as the government has argued elsewhere, *see United States v. Ruiz–Morales*, No. 05–CR–10109 (D. Mass. filed Apr. 20, 2005), Gov't's Mot. to Recons. [Doc. No. 11], that Justice Breyer's opinion in Remedial *Booker* interpreted "court" in the Sentencing Reform Act to require "the judge without the jury" to find the facts necessary to an enhancement, rather than "the judge working together with the jury". 543 U.S. at 249, 125 S.Ct. 738.[67] This Court is not "working together with the jury" in the sense Justice Breyer condemned, however. Justice Breyer was rejecting the solution proposed by the Remedial *Booker* dissenters (i.e., conclusive jury fact-finding). As discussed above and demonstrated by this case, *see infra* Parts V & VI, the jury determination is merely advisory on the enhancement issue; the Court—as is presently required—makes its own, *independent* findings on relevant enhancement facts.

The government apparently can perceive no benefit from having a jury finding on an issue which the Court is "obligated not to be bound by". *United States v. Ruiz–Morales*, No. 05–10109, Hr'g on Mot. to Recons., Mar. 31, 2006 [Doc. No. 16], Tr. at 15. The government is "unclear as to how the presence of a jury and the jury's rendering a verdict which [the Court] must not be bound by helps [the Court] with [its] fact finding". *Id.* at 16. Let me again explain:

The American jury "is the purest example of democracy in action that I have ever experienced."

The American jury must rank as a daring effort in human arrangement to work out a solution to the tensions between law and equity and anarchy.

No other legal institution sheds greater insight into the character of American justice. Indeed, as an instrument of justice, the ... jury is, quite simply, the best we have. "[T]he greatest value of the jury is its ability to decide cases correctly." We place upon juries no less a task than discovering and declaring the truth in each case. In virtually every instance, these twelve men and women, good and true, rise to the task, finding the facts and applying the law as they, in their collective vision, see fit. In a very real sense, therefore, a jury verdict actually embodies our concept of "justice." Jurors bring their good sense

---

determine whether the crime is voluntary manslaughter or murder in the first or second degree.

**67.** As Justice Stevens pointed out, this interpretation of "court" was hardly necessary. *Booker*, 543 U.S. at 286–87, 125 S.Ct. 738 (Stevens, J., dissenting in part). A similar debate occurred in 1788 during the debate on ratification of the Constitution. Responding to criticism by some that "Court" as used therein effectively abolished juries, John Marshall retorted,

Does the word Court only mean the Judges? Does not the determination of a jury, necessarily lead to the judgment of the Court? Is there any thing here which gives the Judges exclusive jurisdiction of matters of fact?

What is the object of a jury trial? To inform the Court of the facts. When a Court has cognizance of facts, does it not follow, that they can make enquiry by a jury? It is impossible to be otherwise. I hope that in this country, where impartiality is so much admired, the laws will direct facts to be ascertained by a jury.

John Marshall on the Fairness and Jurisdiction of the Federal Courts (June 20, 1788), *in* 2 *Debate on the Constitution, supra,* at 730, 736. Though Remedial *Booker* was interpreting the Sentencing Reform Act of 1984, the similarity between the language of that Act and the Constitution in this respect—as well as the debate surrounding the meanings of the word "court"—is patent. How far we have· strayed in the intervening 218 years.

and practical knowledge into our courts. Reciprocally, judicial standards and a respect for justice flow out to the community. The acceptability and moral authority of the justice provided in our courts rests in large part on the presence of the jury. It is through this process, where rules formulated in light of common experience are applied by the jury itself to the facts of each case, that we deliver the very best justice we, as a society, know how to provide.

. . . .

Only because juries may decide most cases is it tolerable that judges decide some. However highly we view the integrity and quality of our judges, it is the judges' colleague in the administration of justice—the jury—that is the true source of the courts' glory and influence. The involvement of ordinary citizens in a majority of the court's tasks provides legitimacy to all that is decreed. When judges decide cases alone, they are still surrounded by the recollection of the jury. Judicial voices, although not directly those of the community itself, echo the values and judgments learned from observing juries at work.

William G. Young, *An Open Letter to U.S. District Judges,* Fed. Law., July 2003, at 30 (footnotes omitted). Put another way, in addition to all the structural constitutional reasons detailed earlier, *see supra* Part III.B., the conclusions of twelve lay people who have examined the evidence and deliberated thereon are more likely to be correct (and accepted) than the pronouncement of a single, jaded and calloused employee of the state. Moreover, unlike the Court, which must consider extra-evidence data such as the pre-sentence report, if the only data relied upon by the jury are those that pass muster under the Federal Rules of Evidence (which themselves exist to serve truth-seeking, *see* Fed.R.Evid. 102), the result reached is likewise more likely to be accurate. As was recognized long ago, jury fact-finding is "the best criterion[ ] for investigating the truth of facts[ ] that was ever established in any country." 3 Blackstone, *supra,* at 385.

Judge Joseph R. Goodwin has explained how this principle relates to his role in sentencing under the "advisory" Guidelines:

One of the fundamental problems with advice is determining how much confidence to place in it. The reliability of the advice helps inform that determination, and reliability is best quantified through an appropriate standard of proof.

Specifically, the reasonable-doubt standard offers a useful method for measuring the degree of certainty that I have in the factual determinations underpinning the advisory Guideline range.

. . . .

. . . . While this additional consideration is no more binding on my determination than the advisory Guidelines themselves, it will help me to weigh the reliability of the advice provided by the Guidelines, and will inform the exercise of my discretion as I determine an appropriate sentence in light of the advisory Guideline range and the 3553(a) factors.

*United States v. Gray,* 362 F.Supp.2d 714, 720, 723 (S.D.W.Va.2005). Though Judge Goodwin applies the reasonable doubt standard himself, the results of an analysis performed by a jury under the same standard inform this Court in the same manner he details. By employing this procedure, the Court simply seeks to enhance the precision of the fact-finding process. Surely no reasonable person would argue that this Court is not permitted to consider the strength of the evidence against the defendant in the exercise of its sentencing

discretion. *See United States v. Dazey*, 403 F.3d 1147, 1177 (10th Cir.2005) ("District Courts might reasonably take into consideration the strength of the evidence in support of sentencing enhancements, rather than (as in the pre-*Booker* world) looking solely to whether there was a preponderance of the evidence, and applying Guidelines-specified enhancements accordingly."); *see also* Fed.R.Crim.P. 57(b) ("A judge may regulate practice in any manner consistent with federal law, these rules, and the local rules of the district.").

Finally, given Remedial *Booker's* slim majority and the new composition of the Supreme Court, the state of the law in this area is uncertain and in flux.[68] As a matter of prudence, it serves the interests of judicial economy to try criminal cases in this manner. *Kelley*, 355 F.Supp.2d at 1038 ("In view of the uncertainty surrounding this issue, the court will err on the side of caution in protecting a criminal defendant's constitutional rights. Just as a court should construe a statute to avoid a constitutional infirmity if possible, prudence dictates that the court should adopt sentencing procedures that lessen the potential that a sentence will later be found unconstitutional." (citation omitted)). Should the Supreme Court eventually adopt the view of the Remedial *Booker* dissenters—as this Court understands the Constitution to require—cases tried in this Court by these procedures will not have to be retried, as the jury already will have issued a verdict on the enhancement facts. For this, the government some day will be grateful.

The government's objections to this Court's procedures, then, must come down to a calculated determination to marginalize the American jury and thereby enhance executive power at the expense of the Congress and the judiciary. This Court's procedure instead minimizes the drain on the moral authority of the judiciary, preserving at least a modicum of involvement by its democratic branch and maximizing the voice of the people—to the extent higher courts presently will entertain it.

### 3. The Proper Standard of Proof Concerning Enhancement Facts

Nothing in Remedial *Booker* precludes judges from utilizing a reasonable doubt standard in the determination of enhancement facts. In *Apprendi* the Supreme Court held that, in addition to having a jury find every fact, "[e]qually well founded is the *companion right* to have the jury verdict based on proof beyond a reasonable doubt." *Apprendi*, 530 U.S. at 478, 120 S.Ct. 2348 (emphasis added). The decision in *Apprendi* rested on both the Sixth Amendment and the Fourteenth. *See id.* at 476–77, 120 S.Ct. 2348. To which right, then, is the reasonable doubt standard a "companion"—the Sixth Amendment right to a jury or the right to Due Process? Because *Booker* dealt only with the Sixth Amendment, if the requisite standard of proof is a companion to Due Process, applying a reasonable doubt standard when finding enhancement facts seems compelled under applicable Supreme Court precedent, despite Remedial *Booker*.

---

**68.** Indeed, Justice Ginsburg, who provided the crucial fifth vote for Remedial *Booker*, recently penned a dissent in *Washington v. Recuenco*, —— U.S. ——, —— – ——, 126 S.Ct. 2546, 2554–57, 165 L.Ed.2d 466 (2006), arguing that it was structural error (not harmless error) for the jury not to decide sentencing factors—the very remedy Remedial *Booker* precluded.

Moreover, Chief Justice Roberts and Justice Alito did not sign a concurring opinion by Justice Kennedy which expressed thinly veiled disapproval of *Apprendi* and *Blakely*, though following it as Supreme Court precedent. *See id.* at 2553 (noting curtly that those cases "and their progeny were accompanied by dissents").

The answer is made somewhat more obscure because, in most of the Supreme Court's key rulings on this issue, the government party has been a state, not the federal government. *See Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004); *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); *McMillan v. Pennsylvania*, 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986); *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977); *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975) (Maine); *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (New York). In order to apply Sixth Amendment strictures to states, of course, the Fourteenth Amendment's Due Process Clause must be used. Any mention of Due Process in these cases, therefore, is inherently ambiguous regarding the independent necessity of the Due Process Clause to the holding.

*Apprendi* offers help here. It stated, "At stake in this case are constitutional protections of surpassing importance: the proscription of any deprivation of liberty without 'due process of law,' Amdt. 14, and the guarantee that 'in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury,' Amdt 6." *Apprendi*, 530 U.S. at 476–77, 120 S.Ct. 2348. The separate reference to Due Process is noteworthy. Further, *Apprendi* unequivocally reaffirmed the Supreme Court's decision in *Winship*, see *Apprendi*, 530 U.S. at 484, 490, 120 S.Ct. 2348, which had ruled that the requisite standard of proof was mandated by Due Process, *Winship*, 397 U.S. at 364, 90 S.Ct. 1068. Moreover, *Apprendi* "confirm[ed] the opinion that [the Court] expressed in *Jones*", *Apprendi*, 530 U.S. at 490, 120 S.Ct. 2348, which had itself expressed Due Process concerns with the standard of proof, see *Jones*, 526 U.S. at 242–43, 119 S.Ct. 1215. Because the United States was the government party in *Jones*, in order to mention Due Process, the Fifth Amendment must have been at play. *See id.* at 243 n. 6, 119 S.Ct. 1215 (citing the Fifth Amendment). Due Process need not have been mentioned in *Jones* (nor confirmed in *Apprendi*) if all aspects of these cases could have been disposed of solely on the basis of the Sixth Amendment.

Pre-*Apprendi* cases tend to confirm this conclusion as well. *Mullaney* held that states could not reallocate the burden of proof such that it negates the presumption of innocence; to do so was contrary to Due Process. 421 U.S. at 703–04, 95 S.Ct. 1881. As explained earlier, the reasonable doubt standard is intimately related to this presumption of innocence. *See supra* Part III.C. Likewise, even if some aspects of its holding were subsequently questioned, *McMillan* rested its approval of the preponderance standard for "sentencing factors" on its interpretation of Due Process. *See* 477 U.S. at 91–93, 106 S.Ct. 2411. Indeed, the Sixth Amendment argument of the petitioners in that case "merit[ed] little discussion" in light of the Supreme Court's Due Process holding. *Id.* at 93, 106 S.Ct. 2411.

What becomes clear from these cases is that the standard of proof is not bound up with the identity of the decisionmaker, but rather the nature of the matter to be proved. Pre-*Apprendi* cases adhered to an "element"/"sentencing factor" dichotomy and used that framework to decide when the protections of the Sixth Amendment and Due Process were triggered. Cases since *Apprendi*, however, have adopted a more functional approach to this dichotomy. *See supra* Part III.A. This is the primary teaching of *Apprendi*. *See* 530 U.S. at 487 n. 13, 120 S.Ct. 2348 (limiting the holding of *McMillan* ). .

The absence of pure Due Process discussions in post-*Apprendi* cases indicates that no alteration of the standard of proof set forth in *Apprendi* was intended in those cases. The Supreme Court's decisions in *Blakely* and *Booker* expounded various aspects of the *Apprendi* rule, but not its stated standard of proof. No majority opinion in either *Blakely* or *Booker* mentions the Fifth Amendment or Due Process; both are pure Sixth Amendment cases. The debate in *Booker*, in particular, addressed the identity of the fact-finder, judge or jury, not the standard of proof to be applied. Repeated analyses by various majorities of the Supreme Court, therefore, show that no case subsequent to *Apprendi*—not even Remedial *Booker*—altered the law regarding the Due Process necessity of applying the reasonable doubt standard to enhancement facts.

It may be that Remedial *Booker* contemplated continued (albeit advisory) application of the Guidelines, which theretofore had relied on the preponderance standard for finding the relevant facts. That opinion, however, rested its argument on an interpretation of the Sentencing Reform Act. And unlike judicial fact-finding, which purportedly was mandated by that Act, the preponderance standard emanates from the Guidelines themselves: *"The Commission believes* that use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case." U.S.S.G. § 6A1.3, comment (emphasis added); *see United States v. Watts*, 519 U.S. 148, 156, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997) ("The Guidelines state that it is 'appropriate' that facts relevant to sentencing be proved by a preponderance of the evidence, and we have held that application of the preponderance standard at sentencing generally satisfies due process." (citations omitted)); *see also Stinson v. United States*, 508 U.S. 36, 38,

113 S.Ct. 1913, 123 L.Ed.2d 598 (1993) ("[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline.").

In eventual practice, the permissive use of the preponderance standard, as provided by the Guidelines commentary and pre-*Apprendi* Supreme Court rulings, was turned by circuit court precedent into a mandatory use. *See, e.g., United States v. Santos Batista*, 239 F.3d 16, 21 (1st Cir. 2001). Because these rulings are predicated on the "authoritative" nature of the Guidelines, however, *see Stinson*, 508 U.S. at 38, 113 S.Ct. 1913, Constitutional *Booker* casts significant constitutional doubt on such blind adherence. *See Booker*, 543 U.S. at 306 n. 4, 125 S.Ct. 738 (Scalia, J., dissenting in part) ("[T]he Commission's view of what is 'better' is no longer authoritative, and district judges are free to disagree—as are appellate judges."). Justice Thomas states the point most directly:

The commentary to § 6A1.3 states that the Commission believes that use of a preponderance of the evidence standard [satisfies Due Process]. The Court's holding today [in Constitutional *Booker*] corrects this mistaken belief. The Fifth Amendment requires proof beyond a reasonable doubt, not by a preponderance of the evidence, of any fact that increases the sentence beyond what could have been lawfully imposed on the basis of facts found by the jury or admitted by the defendant.

*Id.* at 319 n. 6, 125 S.Ct. 738 (Thomas, J., dissenting in part) (internal quotation marks omitted). This, in conjunction with the renewed emphasis on the constitutionality of the reasonable doubt standard since *Apprendi*, suggests that a heightened burden of proof, if not explicitly re-

quired by Due Process, is at least permitted.

Several courts since *Booker* have issued decisions in this vein. Judge Gertner, of this District, has been a leading contributor to post-*Booker* judicial scholarship. She writes, "We cannot have it both ways: We cannot say that facts found by the judge are only advisory, that as a result, few procedural protections are necessary[,] and also say that the Guidelines are critically important. If the Guidelines continue to be important, if facts the Guidelines make significant continue to be extremely relevant, then Due Process requires procedural safeguards and a heightened standard of proof, namely proof beyond a reasonable doubt." *United States v. Pimental,* 367 F.Supp.2d 143, 154 (D.Mass.2005).[69] "[E]ven if the Sixth Amendment's jury trial guarantee is not directly implicated because the regime is no longer a mandatory one, the Fifth Amendment's Due Process Clause requirement is." *Id.* at 153.

Judge Joseph F. Bataillon of the District of Nebraska has likewise issued several decisions addressing the Due Process implications of finding enhancement facts by a preponderance of the evidence. *See, e.g., United States v. Okai,* No. 4:05CR19, 2005 WL 2042301 (D.Neb. Aug.22, 2005), *rev'd* 454 F.3d 848 (8th Cir.2006); *United States v. Kelley,* 355 F.Supp.2d 1031 (D.Neb. 2005); *United States v. Huerta–Rodriguez,* 355 F.Supp.2d 1019 (D.Neb.2005). In *Huerta–Rodriguez,* Judge Bataillon wrote that "[a]lthough the advisory Guidelines system does not arouse Sixth Amendment concerns to the extent that a mandatory Guidelines system does, this is not to say that there are no longer any constitutional constraints on sentencing under *Booker*". 355 F.Supp.2d at 1024 (citation omitted); *see also Okai,* 2005 WL 2042301, at *6 n. 4. Judge Bataillon then ruled that even though the defendant had pleaded guilty and waived his right to a jury, the government still would be required to prove enhancement facts to him beyond a reasonable doubt. *Huerta–Rodriguez,* 355 F.Supp.2d at 1027–28. "Whatever the constitutional limitations on the advisory sentencing scheme, the court finds that it can never be 'reasonable' to base any significant increase in a defendant's sentence on facts that have not been proved beyond a

---

**69.** Judge Gertner has also written on the dubious vitality of *United States v. Watts,* 519 U.S. 148, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997), which upheld the use of acquitted conduct in calculating Guidelines ranges if later found by a preponderance of the evidence. *Pimental,* 367 F.Supp.2d at 149–53; *see also United States v. Coleman,* 370 F.Supp.2d 661, 668–73 (S.D.Ohio 2005) (refusing to consider acquitted conduct); *United States v. Gray,* 362 F.Supp.2d 714, 721–22 (S.D.W.Va.2005) (noting that Constitutional *Booker* called the holding of *Watts* into significant question); *United States v. Carvajal,* No. 04 CR 222AKH, 2005 WL 476125, at *5 (S.D.N.Y. Feb.22, 2005) (sentencing convicted defendant to term less than Guidelines range in order to "accord the jury's [not guilty] findings proper respect"); Letter from Jon M. Sands, *supra* note 4, Memorandum at 23–24. *But see United States v. Dorcely,* No. 05–3130, 454 F.3d 366, 371–72, 2006 WL 2034245, at

*3–4 (D.C.Cir. July 21, 2006) (ruling that a court may use acquitted conduct in calculating the recommended Guidelines range); *United States v. Faust,* No. 05–11329, 456 F.3d 1342, 1347–48, 2006 WL 2035467, at *4–5 (11th Cir. July 21, 2006) (same); *United States v. High Elk,* 442 F.3d 622, 626 (8th Cir.2006) (same); *United States v. Vaughn,* 430 F.3d 518, 526–27 (2d Cir.2005) (same); *United States v. Price,* 418 F.3d 771, 787–88 (7th Cir.2005) (same); *United States v. Magallanez,* 408 F.3d 672, 684–85 (10th Cir.2005) (same); *United States v. Duncan,* 400 F.3d 1297, 1304–05 (11th Cir.2005) (same).

*See also United States v. Malouf,* 377 F.Supp.2d 315, 320–27 (D.Mass.2005) (Gertner, J.) (holding that subsequent Supreme Court precedent has effectively overruled *Harris v. United States,* 536 U.S. 545, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002), which exempted facts establishing mandatory minima from the rule of *Apprendi* ).

reasonable doubt." *Id.* at 1028. Therefore, "the court will not rely on facts proved to a mere preponderance of evidence in order to increase a defendant's sentence to any significant degree." *Id.* at 1029; *see also United States v. Harper,* 360 F.Supp.2d 833, 836 (E.D.Tex.2005) (Clark, J.) ("[S]entence enhancements under the guidelines require more than inferences drawn from a preponderance of the evidence."). Judges Gertner and Bataillon are, of course, correct. The Fifth Amendment and its *current* Supreme Court interpretation require proof beyond a reasonable doubt of enhancement facts.

Like me, those two judges are district judges. The First Circuit in *Yeje-Cabrera,* however, interpreted Remedial *Booker* to mandate the use of a preponderance standard in finding Guidelines enhancement facts: "The district court was not 'constrained' by the jury's verdict, as it thought it was, to finding less than 500 grams of cocaine. *Instead, it could (and should) have found [the defendant] responsible for the amount of cocaine established by a preponderance of the evidence against him* .... That alone is reason to vacate the sentence and to remand." 430 F.3d at 23 (emphasis added).[70] Even though the preponderance standard originated in the Guidelines themselves [71]—and this Court is supposedly "free to disagree"—such a categorical rejection of Guidelines "policy" would run counter to Pho. The straightforward language of these decisions admits of no equivocation. I hear and I obey. Thus, in the face of *Yeje-Cabrera* and *Pho,* this Court is bound to apply a preponderance standard to enhancement facts, at least until it is persuaded that "the law" on this issue has changed.

## V. Kandirakis's Trial

Kandirakis's trial commenced on September 12, 2005. The government had no evidence of undercover buys from Kandirakis, but it did have hard evidence in the form of taped telephone conversations in which he was heard to offer OxyContin for purchase. These telephone conversations painted Kandirakis as a willing conspirator in an OxyContin conspiracy—though, a rather pathetic wannabe OxyContin retailer who was trying to achieve greater market share at Arco's expense. This created a bit of a problem for the government, as Arco was supposedly a co-conspirator with Kandirakis. The government sought to stitch Siciliano, Arco, and Kandirakis to-

---

70. The Third Circuit also recently held that Guidelines enhancement facts should be found by a preponderance of the evidence. *United States v. Grier,* 449 F.3d 558, 563 (3d Cir.2006). That opinion tied the standard of proof to the Sixth Amendment jury right: "That a defendant does not enjoy the right to a jury trial under *Booker* ineluctably means that he or she does not enjoy the right to proof beyond a reasonable doubt." *Id.* at 564. Citing *Apprendi, Blakely,* and *Booker,* the court (strangely) used the formalistic, pre-*Apprendi* "element"-"sentencing factor" dichotomy to rule that "[i]t is to these facts [elements], and to these facts alone, that the rights to a jury trial and proof beyond a reasonable doubt attach." *Id.* at 565. The Third Circuit, on July 19, 2006, vacated the panel decision in *Grier* and will be rehearing the case *en banc.* *See United States v. Grier,* 453 F.3d 554 (3d Cir.2006).

 Likewise, the Eighth Circuit recently reversed a sentence imposed by Judge Bataillon because he did not apply the preponderance standard to Guidelines enhancement facts. *United States v. Okai,* No. 05–3560, 454 F.3d 848, 851–52, 2006 WL 2011338, at *2–3 (8th Cir. July 20, 2006).

71. The Federal Public Defenders, in addition to arguing that the preponderance standard is unconstitutional, have proposed that the Sentencing Commission change the Guidelines' policy statement on this issue in the interest of procedural fairness and accuracy. *See* Letter from Jon M. Sands, *supra* note 4, Memorandum at 1–4.

gether with the testimony of Jonah Adelman ("Adelman").

As is frequently the case in federal criminal prosecutions, Adelman was himself a pled-out drug offender trying to earn a lighter sentence by making other cases for the government. While he duly performed here, testifying both as to the conspiracy itself and the quantity of OxyContin in play, Adelman was extensively and sagaciously cross-examined and his credibility severely shaken—especially as to Kandirakis, who was the least involved. Nevertheless, when the government rested, the Court found by a fair preponderance of the evidence, pursuant to *United States v. Petrozziello*, 548 F.2d 20 (1977), that Kandirakis was, in fact, a member of the alleged OxyContin conspiracy and that the hearsay statements provisionally admitted under Federal Rule of Evidence 801(d)(2)(E) were all properly admitted.

On the sixth day of trial, the Court properly charged the jury and expressly asked them—if they found Kandirakis guilty—to find the amount of drugs properly attributable to him:

> Now, if the government proves [an OxyContin conspiracy], you may find Mr. Kandirakis guilty [on] Question 1. If there exists a reasonable doubt as to [a conspiracy,] you must find him not guilty. Then you stop, you return a verdict.
>
> Now, Question 2. Again, you only get to Question 2, don't even think about Question 2 until unanimously you have agreed that Mr. Kandirakis is guilty of conspiracy to distribute [OxyContin] pills. . . . .
>
> If you think he's guilty, and that's how you're going to check Question 1, then I need to know how much. . . . .
>
> . . . .
>
> Now, if you can tell me beyond a reasonable doubt a specific number of pills, write that in there. You all have

to agree. It has to be unanimous. But if you can't tell me a specific number of pills, but any of these categories that I've listed below is a category that the government has proved beyond a reasonable doubt, check that category. The law in effect makes it easy. They don't have to prove a specific number of pills. They can prove the category. Only make one check. Check that you agree.

> . . . .
>
> . . . . If you cannot agree, you nevertheless, even if it's a guilty verdict on Question 1, that's an appropriate verdict to return, just leave that blank, and just leave the amounts blank unless you can unanimously agree as I have charged you.

*United States v. Kandirakis*, No. 04–10372 (D. Mass. filed Dec. 15, 2004), Jury Charge [Doc. No. 61], Tr. at 18–19, 20, 23. Neither party objected to these aspects of the charge.

That same day, the jury found Kandirakis guilty of the charged OxyContin conspiracy but, not surprisingly in view of Adelman's deficiencies, was not persuaded beyond a reasonable doubt that any particular amount or range of amounts of OxyContin pills were properly attributable to Kandirakis. A copy of the verdict slip is attached as Appendix A.

It is important to note how simple and natural is the flow of the trial under these procedures. Because drug quantity is truly relevant conduct, it is an obviously persuasive aspect of the government's case. Since Spring of 2004 when the Court began following these procedures (or revisions thereof), there have been in this session at least eight jury trials of ten defendants in which Guidelines enhancement questions have been put to the jury, involving not only questions of drug quantity, *see United States v. Kandirakis*, No. 04–10372 (D. Mass. filed Dec. 15, 2004),

Jury Verdict [Doc. No. 38] (U.S.S.G. § 2D1.1(c)); *United States v. Hernandez*, No. 04–10319 (D. Mass. filed July 14, 2004), Jury Verdict [Doc. No. 87] (same); *United States v. Martin*, No. 04–10200 (D. Mass filed July 14, 2004), Jury Verdict [Doc. No. 37] (same); *United States v. Figueroa*, No. 04–10098 (D. Mass. filed Apr. 2, 2004), Jury Verdict [Doc. No. 112] (same); *United States v. Lino*, No. 03–10377 (D. Mass. filed Dec. 11, 2003), Jury Verdict [Doc. No. 39] (same); *United States v. Teague*, No. 03–10362 (D. Mass. filed Dec. 3, 2003), Jury Verdict [Doc. No. 173] (same); *United States v. Baez*, No. 03–10201 (D. Mass. filed June 11, 2003), Jury Verdict [Doc. No. 51] (same), but also questions of the amount of tax loss from false returns and whether the evasion employed sophisticated means, *see United States v. Griffin*, No. 05–10175 (D. Mass. filed July 13, 2005), Jury Verdict [Doc. No. 124] (U.S.S.G. §§ 2T4.1, 2T1.1(b)(2)), and whether the defendant was an organizer, manager, or supervisor of criminal activity, *see Hernandez*, No. 04–10319, Jury Verdict (U.S.S.G. § 3B1.1); *Teague*, No. 03–10362, Jury Verdict (same).[72] As any trial judge will confirm, an American jury can skillfully and impartially handle all these matters with discernment and dispatch. While one can conceive of issues surrounding enhancements, such as commission of the charged crime while on probation or supervised release from another crime, which would be improper to fold into the government's case-in-chief, such matters can be easily handled by a bifurcated proceeding, *see* U.S. Sentencing Commission, *Preliminary Findings, supra*, at 4, 10. At trial, the procedures are fair.[73], simple, and understandable. In short, wholly apart from constitutional considerations, these procedures work—and work well.

With utmost respect, therefore, it is the duty of this trial judge to point out that Justice Breyer and those who agree with him are simply wrong to assume that the American jury cannot handle these issues. *See Booker*, 543 U.S. at 254–55, 125 S.Ct. 738 (Breyer, J., for the Court) (wondering how juries could ever handle the complexities of the Guidelines); *Apprendi*, 530 U.S. at 556–57, 120 S.Ct. 2348 (Breyer, J., dissenting).[74] Also misplaced is the concern that such a system "put[s] [defendants] in the untenable position of contesting material aggravating facts in the guilt phases of their trials". *Blakely*, 542 U.S. at 334–35, 124 S.Ct. 2531 (Breyer, J., dissenting); *Apprendi*, 530 U.S. at 557–58, 120 S.Ct. 2348 (Breyer, J., dissenting). Defendants can and do waive their right to jury factfinding when potentially prejudicial evidence would be presented to the jury to prove a Guidelines enhancement. *See, e.g., Mittel–Carey*, No. 05–10335 (waiving right

---

**72.** The verdict slips cited in this paragraph, except Kandirakis's, are included as Appendix B.

**73.** Despite government protestations that these procedures are an "unfair obligation", *United States v. Duverge*, No. 05–10265 (filed Sept. 29, 2005), Mot. to Recons. Re: Proof of Enhancements [Doc. No. 37] at 6, fully nine out of a possible ten defendants have been found guilty in trials under these procedures. Though too small of a sample size to draw any meaningful conclusions, this 90% conviction rate in jury trials is not inconsistent with the national average of 84% from 1989–2002.

*See* Andrew D. Leipold, *Why Are Federal Judges So Acquittal Prone?*, 83 Wash. U. L.Q. 151, 152 (2005).

**74.** Justice Breyer's brilliant work, *Active Liberty: Interpreting Our Democratic Constitution* (2005), proceeds from the proposition that "the Constitution [is] centrally focused upon active liberty, upon the right of individuals to participate in democratic self government". *Id.* at 21. A district judge might wonder wistfully why Justice Breyer does not recognize the role of direct democracy within the judicial branch itself.

to jury trial on the number of photographs in defendant's possession that portray child pornography and whether certain of them are sadistic or masochistic). Indeed, many waive it regardless. *See, e.g., Ruiz–Morales*, No. 05–10109, Letter from Defendant to Judge Young of Apr. 24, 2006 [Doc. No. 17] at 1. In addition, these procedures do not extend the time of trial to any meaningful degree because the government (almost always) wants to place all truly relevant conduct before the jury anyway. Regardless, total judicial economy is improved, as any truly contested enhancement fact nevertheless would have to be put to an often-redundant evidentiary hearing.[75] Finally, over two years of experience in this session indicates that these procedures do not appear to have any effect on the rate defendants plead guilty (always a matter of super-sensitivity to the government). In short, juries can and should perform Guidelines enhancement

fact-finding, as a matter both of practice and of constitutional procedure.

## VI. Kandirakis's Sentencing

On February 24, 2006, Kandirakis came before the Court to be sentenced. Having fully tried the issue of drug quantity to the jury, this Court naturally had before it a fully nuanced trial record, replete with a skillful and thorough evidentiary presentation by the government and an equally skillful and discerning cross-examination that eroded credibility and exposed weak points in the government's presentation.

The Court also had before it this District's typically extensive pre-sentence report, as well as statistical data concerning the average sentence imposed for this crime nationwide, in the First Circuit, and in this District. The Court also consulted a sentencing database which sets out and explains every criminal sentence imposed in this session during the past 21 years.[76]

---

75. These observations are consistent with historical evaluations of the efficiency of trial by jury. In the debate over ratification of the Constitution, James Wilson, speaking of the advantages of trial by jury remarked, "[A]nd moreover, it is a cheap and expeditious manner of distributing justice." 1 *Debate on the Constitution, supra,* at 855. Blackstone wrote similarly: "[T]rial by jury . . . is also as expeditious and cheap as it is convenient, equitable, and certain; for a commission out of chancery, or the civil law courts, for examining witnesses in one cause will frequently last as long, and of course be full as expensive, as the trial of a hundred issues at nisi prius: and yet the fact cannot be determined by such commissioners at all; no, not till the depositions are published and read at the hearing of the cause in court." 3 Blackstone, *supra,* at 378–79.

Blackstone, of course, makes an excellent comparison: If not juries to try cases, then it must be judges. *See* Jennifer K. Robbennolt, *Evaluating Juries by Comparison to Judges: Jury Decisionmaking a Benchmark for Judging,* 32 Fla. St. U.L.Rev. 469, 470 (2005). English experience with the efficiency of such a system is the stuff of parody. *See* Charles Dickens, *Bleak House* 16–18 (Penguin

ed.1996) (describing the fictional—and interminably complex—case of "Jarndyce and Jarndyce" in the Court of Chancery).

76. In the wake of Remedial *Booker*, the judiciary has been strangely conflicted about its central role in fashioning individually fair and just sentences. After all, the central premise of Remedial *Booker*—contrary to the legislative history of the Sentencing Reform Act of 1984 and all available evidence—is that, when Congress learned it could not constitutionally have mandatory guidelines, it would have said, "Trust the judges with advisory guidelines, they know what they're doing."

It appears the inferior judiciary itself has substantial misgivings about the validity of this premise. How else to explain the pall of secrecy that has fallen over federal sentencing? Today, the Judgment and Commitment Order—the central document that explains in standardized terms the precise reasons for the sentence, and its relationship to the Sentencing Guidelines, *see supra* note 37—is denominated by the Judicial Conference "Not for Publication".

[T]he [Sentencing Reform Act]—in a section entitled "Statement of reasons for imposing a sentence"—requires sentencing judges

who choose to vary from the now-advisory Guideline range to describe why in open court and commit those reasons to paper "with specificity in the written order of judgment and commitment." One might think that this provision would result in a veritable flood of well-reasoned sentencing opinions. But one would be wrong.

The Administrative Office of the U.S. Courts ("AO") has created an anemic form ostensibly in an effort to comply with this requirement in the wake of *Booker*. Ironically described as a "Statement of Reasons," this document contains a parade of nearly meaningless check boxes that mirror the broad § 3553(a) factors. While it does provide space for a factual justification, the form almost seems designed to encourage the kind of mechanical—and arguably unreasoned—approach to sentencing *Booker* tried to extinguish. This is thin gruel, indeed, for our unfortunate appellate judge. Compounding the injury, the AO prevents the public from seeing these insipid documents, just as it refuses to release all judge-specific information about sentences. By limiting judicial transparency, the AO's deeply misguided resorts to secrecy only further the distrust and disdain that the other branches of government and, sadly, the public increasingly direct toward the judiciary.

Improving the quality and availability of all sentencing information—including sentencing opinions and judge-specific sentencing data—can yield numerous benefits. For example, if the court of appeals has the statistics demonstrating how the various district courts in its circuit exercise their sentencing discretion, it will be better able to give life to the concept of "reasonableness" review.

Complete contextual information coupled with a meaningful written explanation will allow the appellate courts to put the sentence into the proper perspective.

Steven L. Chanenson, *Write On!*, Yale L.J. (The Pocket Part), July 2006, http://www.the-pocketpart.org/2006/07/chanenson.html.

The District of Massachusetts is a shining exception to the prevailing secrecy about sentencing. By vote of the judges, the Judgment and Commitment Order in every case in this District is a public document unless the individual judge shall, for case-specific reasons, otherwise order. Moreover, my colleague, Judge Nancy Gertner, is probably the nation's leader in articulating completely the grounds for her sentences in fully developed sentenc-

ing opinions. *See, e.g., United States v. Mueffelman*, 400 F.Supp.2d 368 (D.Mass.2005); *United States v. Malouf*, 377 F.Supp.2d 315 (D.Mass.2005); *United States v. Pineyro*, 372 F.Supp.2d 133 (D.Mass.2005); *United States v. Pimental*, 367 F.Supp.2d 143 (D.Mass. 2005). The failure of district judges explicitly to explain the grounds for their sentencing is drawing increased criticism.

What we need to make this system work, however, are true sentencing *judgments*. The Guidelines have changed judicial practice in this field. Judges once felt empowered just by virtue of their robes to do justice in sentencing; now they seem to feel incompetent without the Sentencing Manual. That sociology of sentencing will need to change if the imposition of mandatory Guidelines, as a practice, is ever to be left behind. The onus in this respect is on district courts, for if the criterion of post-*Booker* review for reasonableness is the well-reasoned-ness of the sentence, then sentencing courts will bear the burden of showing real, independent, and nuanced consideration of all their sentences if they hope for their non-Guideline sentences to stand up. If they give appropriate reasons then they should be entitled to deference, but that means they have to give their reasons in sentencing opinions that take time and effort to create. Yet if the federal judiciary takes up this mantle, and defends its discretion and its unique ability to do justice in sentencing, then the advisory Guideline system created by *Booker* can be made to work.

Citron, *supra* note 36.

For my own part, I have tried for 21 years to explain to the offender and the government the grounds for every single sentence imposed. I speak from the bench at the time of sentencing and lay out as cogently as I can precisely those case- and offender-specific characteristics that have led me to the sentence imposed. Only once, for the sentencing of Richard Reid, *see United States v. Reid*, No. 02–10013 (D. Mass. filed Jan. 16, 2002), have these explanations ever received any notoriety, but they are delivered at the close of every single sentence. Donald Womack, this session's official court reporter, *see supra* note 5, prepares the transcript of these remarks that same day. They are attached to the Judgment and Commitment Order and transmitted electronically to the Sentencing Commission. I am informed that the Sentencing Commission never reads them. No matter.

The Court opened the sentencing hearing by reciting these various data points. These data are important to this Court's approach to sentencing, as they reflect what actual courts and actual judges (including me) are actually doing in the crucible of actual, specific sentencing decisions. If the judiciary is truly interested in criminal sentences that are generally uniform and deviate from the norm only for case- and offender-specific reasons—and this Court is—then these are the crucial data. If the resulting Guidelines range encompasses these data points, the "advice" of the Guidelines is correspondingly stronger; if, as frequently happens, the data points cluster about a range considerably lower than the recommended Guidelines range, then their "advice" is less persuasive to the Court since the overwhelming evidence is that actual offenders receive lesser sentences. In every case since the First Circuit's *Jimenez–Beltre* decision, of course, this Court accords the Guidelines the deference there commanded.[77]

The data points having duly been recited, the Court proceeded with its Guidelines calculation. At this point, the central factual dispute—the drug quantity calculation—came to the fore. Kandirakis's counsel argued that, given the jury finding

that the government had failed to prove *any* drug quantity beyond a reasonable doubt, this Court must sentence at the lowest possible drug quantity range (i.e., as if no drug quantity were proven).

Consistent with the reasoning set out above, this Court disabused counsel of the supposition that the jury verdict was controlling on the Court, but at once went on to find that, given Adelman's suspect credibility, the Court, too, had a reasonable doubt that the government had proven that any specific drug quantity or range was attributable to Kandirakis. Argument then turned to whether the government had proven at trial any specific drug quantity or range by a preponderance of the evidence—the standard of proof this Court felt constrained to apply.[78] The government argued for a higher quantity, Kandirakis's counsel for a lower one.

It is important to note that, throughout these proceedings, there was not the least hint of vindictiveness against Kandirakis for proceeding to trial. *Cf. Green*, 346 F.Supp.2d at 278, 328–30 (secretly "swallowing" the gun in return for a plea). *But see Yeje–Cabrera*, 430 F.3d at 26–28 (recognizing no vindictiveness in "regurgitating" the gun when the plea deal fell

What is important is that Mr. Womack has now assembled, in a fully searchable, publicly available database all 21 years of these sentencing data. The database includes the offense(s) of conviction, the date of sentence, the precise sentence imposed, and the reasons therefor. The database may presently be accessed at http://donwomack.com at no charge. Our Court will vote at its September meeting whether to place the entire database on the Court's official website.

77. *Jimenez–Beltre* came as no surprise to this Court. Even before that decision, I believe I was acting in scrupulous obedience to Remedial *Booker*. An appropriate concern for transparency, however, has required this Court to explain its procedures in complete detail.

78. Kandirakis's sentence was imposed after the First Circuit's commands in *Yeje–Cabrera*, but before it declared in *Jimenez–Beltre* that the Guidelines were entitled to substantial weight, and before the Court realized the potential scope of *Pho's* declaration that the Guidelines' policy choices (e.g., the use of the preponderance standard) were immune from judicial reconsideration. Since the full and fair implication of these decisions, taken together, indicates that these "advisory" Guidelines are functionally near-mandatory, the need for proof beyond a reasonable doubt may now be constitutionally necessary, even under *Booker*. The Court expresses no opinion on this argument here; it suffices to note that the use of the preponderance standard in Kandirakis's case does not foreclose consideration of these later developments.

through). Commendably, here, the government's view of the "facts" was entirely consistent throughout the prosecutions of Siciliano, Arco, and Kandirakis. Where the government engaged in fact bargaining (Siciliano), it was candidly acknowledged. Moreover, the government's statement of the conspiracy was the same as to Arco (who pled), as it was for Kandirakis (who went to trial).[79]

After full consideration of the entire trial record, the pre-sentence report, and the able arguments of both counsel, this Court found by a fair preponderance of the evidence that 250 OxyContin pills were properly attributable to Kandirakis.

This determination made, the Court could proceed to calculate the suggested Guidelines range. This last act illustrates the pervasive shadow the so-called "advisory" Guidelines continue to cast over federal sentencing today. At the time of Kandirakis's offense, in 2003, the drug quantity Guidelines enhancement was based on the aggregate weight of the OxyContin pill. *See* U.S.S.G. § 2D1.1(c), comment (n. (A) & Drug Equivalency Tables) (Nov.2002) (using a conversion of 1g as equivalent to 500g of marijuana). Applying the then-applicable 2002 Guidelines yielded a Guidelines range of 21–27 months in prison.[80] According to the 2005 Guidelines Manual, in effect at the time of Kandirakis's sentencing, however, the drug quantity was to be figured based on the actual weight of the oxycodone within pills themselves. *See* U.S.S.G. § 2D1.1(c), comment (n. (B) & Drug Equivalency Tables) (Nov.2005)

(using a conversion of 1g of oxycodone equivalent to 6700g of marijuana). The range pursuant to the 2005 Guidelines was 51–63 months in prison. Kandirakis's counsel argued that, just as was the case under the mandatory Guidelines, *United States v. Cruzado–Laureano,* 404 F.3d 470, 488 n. 10 (1st Cir.2005) (citing *United States v. Colon–Munoz,* 318 F.3d 348, 361 (1st Cir.2003)), it would violate the Ex Post Facto Clause of the Fifth Amendment, U.S. Const, art. I, § 9, cl. 3, to use the more recent version.

Of course, were the Guidelines truly "advisory", Kandirakis's argument would lose much of its force, as the Court could fashion an individualized sentence based on the best sociological and penological data known to it at the time of sentence. *See United States v. Roche,* 415 F.3d 614, 619–20 (7th Cir.2005) (questioning whether the Ex Post Facto Clause has any role to play in an advisory Guidelines world). This Court, however, is required to give substantial weight to the Guidelines, *Jimenez–Beltre,* 440 F.3d at 517, and may not question even the unexplained policy choices of the Sentencing Commission, *Pho,* 433 F.3d at 62. The doctrine of constitutional avoidance, *see Rust v. Sullivan,* 500 U.S. 173, 190–91, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991), thus comes fully into play here, and as a matter of prudence, this Court adopted the Guidelines range suggested by the manual in force at the time of Kandirakis's offense: 21–27 months.

For all the reasons set forth above[81], after a full and fair trial of these matters,

---

79. Inexplicably, the pre-sentence report for Kandirakis contained an obscure reference to a confidential, undercover source ("CW2") who purportedly could attribute 900 OxyContin pills to Kandirakis. It appears this data came from someone in the government. When this was called to the attention of Assistant United States Attorney Nancy Rue as a possible violation of the Court's order that Guidelines enhancement facts be proved to

the jury, she promptly eschewed any reliance on this source.

80. This range factors a 2–point reduction into the base offense level for Kandirakis's minor role in the OxyContin conspiracy, U.S.S.G. § 3B1.2(b), and a criminal history category of "I".

81. As in every case, *see supra* note 76, the Court explained the sentence to the defendant:

immeasurably aided (but not controlled) by an American jury, this Court sentenced Kandirakis to 2 years in the custody of the United States Attorney General.[82]

## VII. CONCLUSION

Undoubtedly, these will not be the final words on the current state of federal sentencing and the constitutionality of functionally mandatory Guidelines. In reality, though, we have long possessed all the words we will ever need:

> [L]iberties ... cannot but subsist, so long as this palladium [trial by jury] remains sacred and inviolate, not only from all open attacks, (which none will be so hardy as to make) but also from all secret machinations, which may sap and undermine it[ ] by introducing new and arbitrary methods of trial.... And however convenient these may appear at first, (as doubtless all arbitrary powers, well executed, are the most convenient) yet let it again be remembered, that delays, and little inconveniences in the forms of justice, are the price that all free nations must pay for their liberty in more substantial matters; that these inroads upon this sacred bulwark of the nation are fundamentally opposite to the spirit of our constitution; and that, though begun in trifles, the precedent may gradually increase and spread, to the utter disuse of juries in questions of the most momentous concern.

4 Blackstone, *supra*, at 343–44. Heeding these words, this Court will continue to do its part to protect our citizens' voice in the judiciary. Will others do the same?

---

I have no doubt that to the outside world you have lived an upstanding life. And I understand your apology to everyone for getting them involved in this.

You must understand, Mr. Kandirakis, that you have dealt serious drugs. These are not some sort of recreational, the type of drugs used by the good people. These are dangerous, prohibited drugs. And you, sir, are a drug dealer. There are others involved. There are others more seriously involved. You throughout the period of this conspiracy were a wannabe. You wanted to be more involved, you wanted to be more central to serious drug dealing.

Now, the Court has taken all the circumstances into account. The Court has been slow and thorough. The Court has made precise and careful fact finding. Having done so, it is clear that relative to the other two co-defendants your involvement is less. That said, you are a guilty felon of serious drug dealing.

*United States v. Kandirakis*, No. 04–10372 (D. Mass. filed Dec. 15, 2004), Sentencing Hr'g [Doc. No. 69], Tr. at 50.

**82.** It is not without some irony that this is, in every respect, a "Guidelines sentence", duly reported to and so recorded by the U.S. Sentencing Commission.

APPENDIX A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES of AMERICA )
 ) CRIMINAL ACTION
 v. ) NO. 04-10372-WGY
 )
GEORGE KANDIRAKIS )

JURY VERDICT

1. On the charge of conspiracy to distribute oxycodone, we find George Kandirakis

 _____ not guilty

 __✓___ guilty

2. If guilty, we find there is reasonably attributable to George Kandirakis _____ oxycodone pills.

| | |
|---|---|
| fewer than 5 pills | _____ |
| at least 5 but fewer than 9 pills | _____ |
| at least 9 but fewer than 19 pills | _____ |
| at least 19 but fewer than 37 pills | _____ |
| at least 37 but fewer than 75 pills | _____ |
| at least 75 but fewer than 112 pills | _____ |
| at least 112 but fewer than 149 pills | _____ |
| at least 149 but fewer than 187 pills | _____ |
| at least 187 but fewer than 746 pills | _____ |
| at least 746 but fewer than 1,306 pills | _____ |
| at least 1,308 but fewer than 1,866 pills | _____ |
| at least 1,866 but fewer than 5,597 pills | _____ |

*Nancy Martin*
 Forelady

Date: 9/26/2005

## APPENDIX B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ISRAEL BAEZ | )<br>)<br>)<br>) CRIMINAL ACTION<br>) NO. 03-10201-WGY<br>)<br>)<br>) |

## JURY VERDICT

1. On the distribution charge, we find Israel Baez:

 _____ not guilty

 ___✓___ guilty of distribution of _over 100 grams_
 of heroin on or about May 30, 2003.

2. On the conspiracy charge, we find Israel Baez:

 _____ not guilty

 ___✓___ guilty of conspiracy to distribute _over 100 grams_
 of heroin on or about May 30, 2003.

 _____Stanley Wong_____
 Foreman

Date: __2/24/04__

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES )
 )
 v. ) CRIMINAL ACTION NO. 03-10377-WGY
 )
ERIC LINO )

## JURY VERDICT

1. On the distribution charge, we find Eric Lino

 _____ not guilty

 ✓ guilty of distribution of ____55.2 grams____ cocaine

2. On the conspiracy charge, we find Eric Lino

 _____ not guilty

 ✓ guilty of conspiracy to distribute cocaine.

 In this conspiracy

 a. _____ is properly attributable to

 Eric Lino

 b. _____✓_____ at least 3.5 kilograms but less

 than 5 kilograms

 c. _____ at least 2 kilograms but less

 than 3.5 kilograms

 d. _____ at least 500 grams but less than

 2 kilograms

 e. _____ at least 400 grams but less than

 500 grams

**340**

f. _____ at least 300 grams but less than 400 grams

g. _____ at least 200 grams but less than 300 grams

h. _____ *at least 100 grams but less than 200 grams WIY*

3. As to the forfeiture claim, we find that the following items are to be forfeited:

a. ____ No ✓ Yes A 2000 Cadillac Escalade, bearing Massachusetts registration No. 19EK03, registered in the name of Gerard Senac

b. ✓ No ____ Yes One Yamaha Waverunner jet ski, #GP800X and GP80824030

c. ✓ No ____ Yes One Yamaha Waverunner jet ski (With jet ski trailer, MA Reg. 900562), #GP1200X and GU00806444

_____
Forelady

Date: Nov. 23rd, 2004

2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
 )
 v. ) CRIMINAL ACTION
 ) NO. 03-10362-WGY
TREVOR ROYCE TEAGUE )
FABIAN A. RUIZ, )
 Defendants. )

JURY VERDICT

1. On the charge of possession of marijuana with intent to distribute, or aiding and abetting such possession, we find Trevor Teague

 _____ not guilty

 __X__ guilty of possession of

 _____ marijuana

 __X__ at least 100 but less than 400 kilograms of marijuana

 _____ at least 80 but less than 100 kilograms of marijuana

 _____ at least 60 but less than 80 kilograms of marijuana

2. On the charge of conspiracy to possess marijuana with intent to distribute, we find Trevor Teague

 _____ not guilty

 __X__ guilty of conspiracy to possess

 _____ marijuana

342

 __X__ at least 100 but less than 400 kilograms
 of marijuana

 _____ at least 80 but less than 100 kilograms
 of marijuana

 _____ at least 60 but less than 80 kilograms
 of marijuana

3. On the charge of possession of marijuana with intent to
distribute, or aiding and abetting such possession, we find
Fabian A. Ruiz

_____ not guilty

__X__ guilty of possession of

_____ marijuana

 __X__ at least 100 but less than 400 kilograms
 of marijuana

 _____ at least 80 but less than 100 kilograms
 of marijuana

 _____ at least 60 but less than 80 kilograms
 of marijuana

4. On the charge of conspiracy to possess marijuana with intent
to distribute, we find Fabian A. Ruiz

_____ not guilty

__X__ guilty of conspiracy to possess

_____ marijuana

 __X__ at least 100 but less than 400 kilograms
 of marijuana

 _____ at least 80 but less than 100 kilograms
 of marijuana

 _____ at least 60 but less than 80 kilograms
 of marijuana

5. Was Fabian A. Ruiz an organizer, leader, manager, or
 supervisor of this criminal activity?

 X no _____ yes

 _____
 Foreman

Date: 2·3·05

344

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
 )
 v. ) CRIMINAL ACTION
 ) NO. 04-10200-WGY
JOHNNIE MARTIN, )
 Defendant. )

JURY VERDICT

We find Johnnie Martin

____✓____ not guilty

_____ guilty of distribution of

 _____ cocaine base

 _____ at least 5 but less than 20 grams
 of cocaine base

 _Joanne K. Leahey_
 Forelady

Date: __2/11/05__

Case 1:04-cr-10098-WGY Document 112 Filed 05/20/2005 Page 1 of 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES of AMERICA )
 )
 v. )
 ) CRIMINAL ACTION No. 04-10098-WGY
CARMEN FIGUEROA and )
WILLIAM TEJEDA, )
 Defendants.)

## JURY VERDICT

We find Carmen Figueroa

_____ not guilty

\_\_✓\_\_ guilty of conspiracy to possess with intent to distribute

 _____ of cocaine base.
 more than 1.5k \_\_\_✓\_\_\_ of cocaine base.
at least 500g but less than 1.5k _____ of cocaine base.
at least 150g but less than 500g _____ of cocaine base.
at least 50g but less than 150g _____ of cocaine base.

We find William Tejeda

_____ not guilty

\_\_✓\_\_ guilty of conspiracy to possess with intent to distribute

 _____ of cocaine base.
 more than 1.5k \_\_\_✓\_\_\_ of cocaine base.
at least 500g but less than 1.5k _____ of cocaine base.
at least 150g but less than 500g _____ of cocaine base.
at least 50g but less than 150g _____ of cocaine base.

 _____
 Forelady

Date: \_\_\_\_5-19-2005\_\_\_\_

**346**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES of AMERICA )
 )
 v. ) CRIMINAL ACTION
 ) NO. 04-10319-WGY
NOEL HERNANDEZ, )
 Defendant.)

## JURY VERDICT

1. On the charge of importation of heroin, we find
 Noel Hernandez

 _____ not guilty ___✓___ guilty

2. On the charge of conspiracy to import heroin, we find
 Noel Hernandez

 _____ not guilty ___✓___ guilty

3. There is attributable to Noel Hernandez

 ___874 grams___ of heroin

 _____ at least 700 grams but less than 1 kilogram

 _____ at least 400 grams but less than 700 grams

 _____ at least 100 grams but less than 400 grams

 _____ at least 80 grams but less than 100 grams

 _____ at least 60 grams but less than 80 grams

 _____ at least 40 grams but less than 60 grams

 _____ at least 20 grams but less than 40 grams

 _____ at least 10 grams but less than 20 grams

 _____ at least 5 grams but less than 10 grams

 _____ Less than 5 grams

4. Was Noel Hernandez an organizer and manager of a criminal
 enterprise involving less than 5 people?

\_\_\_\_\_ no ✔ yes

*Catherine A. Brackini*
Forelady

Date: *July 27, 2005*

2

348

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
 )
UNITED STATES OF AMERICA )
 )
 v. ) CRIMINAL ACTION
 ) NO. 05-10175-WGY
NADINE J. GRIFFIN, )
 Defendant. )
 )
```

JURY VERDICT

1. On the charge of filing a false tax return, we find Nadine Griffin:

 a. As to the 1998 return:

 _____ not guilty

 _____ guilty

 b. As to the 1999 return:

 _____ not guilty

 ___✓___ guilty

2. Were sophisticated means of concealment used?

_____ no

___✓___ yes

3. The amount of the aggregate tax loss is $_____.

_____ more than $200,000

_____ more than $80,000, but less than $200,000

___✓___ more than $30,000, but less than $80,000

_____ more than $12,500, but less than $30,000

_____ more than $5,000, but less than $12,500

_____ more than $2,000, but less than $5,000

_____ $2,000 or less